Pennsylvania Telephone Corporation, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued April 27, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Frank B. Quinn,* of *English, Quinn, Leemhuis & Tayntor,* for appellant.

*Paul D. Larimer,* with him *Harry M. Showalter* and *James H. Duff,* Attorney General, for appellee.

OPINION BY HIRT, J., September 9, 1943:

Appellant acquired the property and facilities of the Bell Telephone Company of Pennsylvania in the City of Johnstown in 1938. The two companies had been in active competition in supplying local telephone service throughout the area by means of manually operated exchanges. In merging the two local systems appellant erected a new central office and exchange building and installed new equipment changing the service from manual to automatic dial operation. In addition, it incorporated into the new system an automatic cut-off device—standard equipment developed and perfected by North Electric Company of Galion, Ohio—which terminated local exchange calls, originating from either individual or multi-party lines, not less than six, nor more than eight minutes after connection was established. The permissible length of telephone conversations, referred to as "holding time", on local calls of these classes was thus restricted automatically. Appellant's tariff on file with the Public Utility Commis-

sion defined a local message as "a message five minutes or less in duration",[1] but prior to the installation of the device, in practice, local calls were not limited as to time either by making an extra charge for the overtime or by manually breaking the connection. There were exceptions. Occasionally an offending user of a party line was made to conform to reasonable holding time in the use of his telephone. But in general throughout the area patrons of both the Bell Company and of the appellant were supplied with unlimited service and this practice continued after the merger until April 22, 1939, when the dial system with the automatic cutoff device went into operation. In its present operation the interrupting device is made to apply only to individual and multi-party lines. Toll calls are exempt as well as calls to private branch exchanges, and subscribers served with more than one trunk line with a rotary mechanism making a connection with any one of a series of telephones not then in use. When the privilege of unlimited holding time was withdrawn on individual and party lines by the operation of the automatic cut-off device, the Commission, reacting to a number of informal complaints, instituted an investigation of *its own motion* under §1008 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS 1398. In the proceeding the Commission raised these questions: (1) Whether terminating local telephone conversations after six minutes is unreasonable, in violation of §401 of the Act, 66 PS 1171,[2]

---

[1] The following is the provision of the tariff: "Local message: A Message five minutes or less in duration from a subscriber's telephone station to another telephone within the same local service area and furnished under the provisions of the exchange (and in the case of semi-public service, the exchange and toll) tariff applicable."

[2] Section 401 provides: "Character of Service and Facilities—Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make

or (2) discriminatory, under §402, 66 PS 1172, or (3) in violation of appellant's regulations in its tariff as filed with the Commission. The single inquiry on this last phase of the investigation was directed to the scope of its definition of a 'local call'.

After hearing, the Commission, on May 13, 1941, made the following order: "That the practice of Pennsylvania Telephone Corporation in terminating local telephone conversations on its Johnstown Exchange be discontinued from and after June 1, 1941." On appeal from that order we allowed a supersedeas and upon motion of appellant remanded the proceeding to the Commission for the taking of further testimony. In the meantime the automatic cut-off device had been installed in appellant's Moxham and Westmont exchanges, making the practice uniform throughout the Johnstown area. After further hearings the Commission, on December 9, 1941, made its second and final order directing: "That the practice of Pennsylvania Telephone Corporation in terminating local telephone conversations to *individual* line subscribers in its Johnstown Exchanges, be discontinued from and after December 31, 1942." It also directed appellant to file supplements to its general tariff to conform with the Commission's findings and the above order. Although there are separate appeals from each of the two orders of the Commission in this proceeding, the appeal from the final order alone need be considered. Other changes in the

all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employes, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the Commission. Subject to the provisions of this act and the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service ......"

system had been made after the first order, and when the record was remanded the Commission proceeded with its investigation de novo. The final order in effect revoked, and was entered in lieu of, the first order.

By its findings the Commission eliminated the second question raised in its investigation. It found that private branch exchanges and rotary groups were reasonable classifications of service, under §402 of the Act, properly exempt from interruption of service on incoming calls. And further that the service supplied by appellant generally, including the operation of the interrupter mechanism on all other classes of service did not violate that section of the act which prohibits unreasonable preference or advantage to one subscriber over another of the same class.[3]

Our inquiry in these appeals therefore is limited to two questions: Whether the operation of the cut-off on both individual and party lines is unreasonable in violation of §401 and whether the practice is inconsistent with the character of the service which appellant offered its subscribers under a local call as defined in its tariff. The former is the controlling question since appellant may file a supplement to its tariff if its definition is not broad enough. But whether appellant has the right to interrupt a call under its existing tariff is related to the general question of reasonableness.

---

[3] We agree with this conclusion. On the other hand it may be questioned whether the final order of the Commission in itself is not discriminatory in violation of §402. No good reason appears for requiring separate classifications of individual and party line subscribers, allowing unlimited service on the one and restricting the other by the operation of the cut-off device. The Commission seeks to avoid the inference of discrimination on the ground of necessity. It concluded that both party and individual lines are entitled to unlimited service but that 25% additional trunk lines and other facilities necessary to provide that service are not now obtainable in the present war emergency. It found that the present equipment was sufficient to give unlimited service to individual lines but not to both classes of subscribers.

It therefore becomes necessary to examine the opinion of the Commission to determine whether the evidence supports its findings and the final order predicated upon them. *Penna. R. R. Co., v. Penna. P. U. C.,* 135 Pa. Superior Ct. 5, 4 A. 2d 622. The Commission has some administrative discretion but only within the limitations imposed by law upon all triers of facts. "It may not be capricious, arbitrary, or unreasonable; and an order of the commission must be founded on competent and relevant evidence, and otherwise be in conformity with law. In the absence of any one of the elements requisite to its validity this court may reverse such order of the Commission. Findings of fact are essential to the validity of its orders. If such findings are lacking, the order is ineffective. *Klawansky v. P. S. C.,* 123 Pa. Superior Ct. 375, 187 A. 248. Although pure questions of fact are for the Commission and not for this court, sufficient legally competent evidence is necessary to support findings of fact by the Commission and to sustain its order. Borough of Franklin v. P. S. C., 73 Pa. Superior Ct. 294; Blackmore et al. v. P. S. C. et al., 120 Pa. Superior Ct. 437, 183 A. 115; Latrobe Water Company v. P. S. C., 123 Pa. Superior Ct. 21, 27, 186 A. 294, 296": *Cage v. P. S. C.,* 125 Pa. Superior Ct. 330, 189 A. 896.

The cut-off device in operation does not restrict a subscriber to one call of six minutes with another station. It merely interrupts the service and a warning tone is sounded one minute before the cut-off. When the connection is thus broken there was nothing to prevent the subscriber from re-dialing the same number and continuing the conversation without limit subject to interruption every six minutes. Of course re-dialing is some inconvenience and there is always the chance that another who has been waiting for an opportunity to call either party may intervene by making a connection. But that is the very purpose of the device. There is some positive evidence of the reasonableness of

a limitation of six minutes when compared with the holding time of the average user of a telephone. There was no objection to the quality of the service supplied by the appellant before the cut-off practice was adopted. The facilities in trunk lines, connecting tracks and appliances which are required in any exchange depends upon the number of calls during the period of the peak load and the average holding time of these calls. It was determined that with the cut-off device the average holding time would be reduced to 83 seconds. The exchanges were built to supply service on that basis (with the allowance of an additional 7 seconds) at a saving of $219,000 as compared with the cost of facilities necessary to supply unlimited service. Any proper rate base for the future, certainly, should reflect the saving. From our common experience nothing inherently unreasonable appears in the limitation of a local call to four times the length of the average holding time of all subscribers using the exchange.

Appellant, in assuming the burden of proof (§420 of the act, 66 PS 1190) produced five executive officers or engineers managing other telephone companies with a total of 71 exchanges using the device, who were qualified to judge its merits from their experience, and who testified in effect that the automatic cut-off is the most significant improvement in telephone service in the past decade, comparable in resulting benefit to the service with the perfection of the dial system; that it reduces the cost of necessary equipment in an exchange by about 20%; that it gives every subscriber the advantage of more general use of the facilities supplied and an equal opportunity of establishing a connection with any other station on the exchanges; that the device speeds up telephone service and curtails unnecessary use of the lines; and that with few negligible exceptions, the public has recognized the advantages from its use. There is evidence that only 3% of those whose

conversations are terminated by the device find it necessary to re-dial.

The Commission, because of the circumstance that all of the exchanges referred to by these witnesses are small in comparison with the exchanges in the Johnstown area, drew the inference that the device although a benefit in small telephone companies will not provide reasonable service in larger exchanges such as here involved. The testimony does not support the inference. The mechanism is a comparatively recent development, installed generally for the most part during the past five years. It is reasonable to expect that small exchanges would be selected for its proving grounds. But the fact remains that according to the undisputed testimony of witnesses best qualified to judge, the practical operation and the benefits from the device have been proven. There is nothing in the testimony suggesting that the present installation is in any respect experimental or that the size of the exchange is a factor to be considered. It is most significant that the telephone engineer, in the employ of the Commission for five years, familiar with proper telephone practice, who was present at the hearings, did not testify that the device was unadapted to the Johnstown exchanges or that its operation does not improve the service.

In addition, appellant produced 20 representative subscribers who testified that limiting of holding time to six minutes resulted in a decided improvement in the service. Against this testimony 12 witnesses appeared for the Commission whose testimony is to the effect (in the language of the Commission) "that the termination of local messages results in delay, inconvenience and disconcerting interruptions." As to all of this testimony the opinion of the Commission contains this comment: "The testimony of numerous telephone subscribers in the Johnstown area, expressing conflicting reactions and opinions of physicians, businessmen, labor representatives, newspapermen, and others prominent

324

in professional, business, and social activities of the community, *is of little aid to us in our determination as to whether local message service as rendered on respondent's Johnstown exchanges is reasonable and adequate under §401 of the Public Utility law* ...... It is to be expected that subscribers will react differently to the automatic cut-off. Certain subscribers, particularly those served through party lines, may welcome its use for the reason that the cut-off may permit a more equitable use of party-line facilities. However, it is clearly indicated that it is essential that uninterrupted service be available to certain subscribers who have a need for such service in their particular use of local telephone service. It is possible that subscribers may use local telephone service for desirable but unessential and unimportant purposes and may unreasonably use such service to the detriment of other subscribers, but the failure of respondent to educate its subscribers in the proper use of the telephone, or to properly police its service in accordance with ample provisions of its filed and effective tariff cannot be deemed a justifiable reason for the use of the cut-off device on local telephone services to all of the subscribers. Every telephone user, whether a subscriber to individual or party-line service, is a potential originator or receiver of local messages for which continuous and uninterrupted transmission is essential and *we believe the needs of subscribers for such service should be reasonably anticipated and made available at all times.*" (Italics added.) Thus, the opinion of the Commission indicates that its findings and order are based on its assumption without support in the evidence that the device is not adapted to the Johnstown exchanges and in the last analysis rests upon nothing more substantial than its *belief* that every subscriber is entitled to unlimited service.

It may be conceded that, depending on the circumstances of a case, it is often difficult to draw the line between regulation which is properly the function of the

Commission, and management, exclusively for those charged with directing the affairs of the company. But in the present case, where no unlawful discrimination was found, we are of the opinion that the Commission overstepped the bounds of proper regulation and assumed the role of manager in directing the change in service.

A rule or a method is not unreasonable merely because it results in some inconvenience to a class entitled to service. And there can be no question as to the right of a telephone company doing a general public business to adopt new methods of furnishing service to its patrons if they are reasonable. Good faith is to be presumed on the part of appellant's officers and the Commission may not substitute its judgment for theirs when the choice is between two systems which provide reasonable and adequate service without discrimination. *State of Missouri v. Public Service Commission of Missouri,* 262 U. S. 276, 43 S. Ct. 544. While a business charged with public interest such as a utility is the proper subject of regulation, the State's powers in this respect are not without limitation. In *Banton v. Belt Line Ry. Corporation,* 268 U. S. 413, 45 S. Ct. 534, it is said: "Broad as is its power to regulate, the state does not enjoy the freedom of an owner. Appellee's property is held in private ownership; and, subject to reasonable regulation in the public interest, the management and right to control the business policy of the company belong to its owners." See also, *Chi. Mil. & St. P. R. R. v. Wisconsin,* 238 U. S. 491. Management cannot be justified under the guise of regulation and we should be slow to interfere with practices adopted by those whose successful life experience well qualify them to determine what methods of operation will work a general improvement of the service. These principles are given full recognition in the decisions of our State. In *Coplay Cement Mfg. Co. v. Pub. Ser. Co.,* 271 Pa. 58, 114 A. 649, our Supreme Court said: "It was not

intended by the legislature that the commission should be a board of managers to conduct and control the affairs of public service companies, but it was meant that where certain of their powers and obligations had intimate relation to the public through fairness, accommodation or convenience, the commission should have an inquisitorial and corrective authority to regulate and control the utility in the field specifically brought within the commission's jurisdiction ...... The rights, powers and privileges not mentioned constitute by far the greater part of corporate life, internal management, control and discretionary power over its property, the proper application, enforcement and enjoyment of the same matters submitted to the commission's control being among them. *In short, the company manages its own affairs to the fullest extent consistent with the protection of the public's interest, and only as to such matters is the commission authorized to intervene, and then only for the special purposes mentioned in the act.*" "The Public Utility Commission is not a super board of directors for the public utility companies of the State and it has no right of management of them. Its sole power is to see that in the matter of rates, service and facilities, their treatment of the public is fair": *Bell Tel. Co. of Pa. v. Driscoll,* 343 Pa. 109, 21 A. 2d 912.

The findings and the order of the Commission are not founded upon, nor supported by, competent evidence. "In determining the service, accommodation, convenience, or safety to the public, the commission may not disregard the evidence and consider the questions from a managerial viewpoint, as that power has not been delegated to it by the legislature, and, when it attempts to do so, it is acting illegally. It must stay within its limits of jurisdiction": *Abington Elec. Co. v. P. P. U. C.,* 131 Pa. Superior Ct. 200, 198 A. 906. See also *Lycoming E. Co. v. Public Ser. Com.,* 67 Pa. Superior Ct. 608. For this reason the order must be reversed.

Some reference may be made to the tariff filed by appellant defining a local message. The Commission in its discussion, above quoted, recognized the right of appellant to 'police' its lines and to terminate a conversation after five minutes but elsewhere in its opinion indicated that the right should be exercised only when overtime pre-emption interfered with the use of the lines by others. Upon the ground that the device did not discriminate between reasonable and unreasonable use in that respect, the Commission found that in operation it violated the tariff. In its practical aspects such policing of all of the calls going through appellant's exchanges would be impossible of performance. In our view the automatic interruption of a local message after six minutes is not inconsistent with the definition of the tariff. Under it appellant had the right of termination after five minutes. The method employed in accomplishing the cut-off is unimportant if the minimum holding time is respected, although in strictness appellant's tariff should be supplemented by a description of the device in operation as applied to all classes of service.

The order in 207 April Term, 1943, is reversed (and with it the order in 108 April Term, 1942.) Appellant is directed to file a supplement to its tariff descriptive of the operation of the cut-off device in its effect upon the various classes of telephone service. The costs to be paid equally by appellant and the Commission.

DISSENTING OPINION BY RHODES, J.:

I would affirm the final order of the commission. In the first place, as I view it, a fundamental error in the majority opinion is the conclusion "that the Commission overstepped the bounds of proper regulation and assumed the role of manager in directing the change in service." The discretionary power of management is limited to the internal affairs of the utility, which do not affect the public interest; and the commission's

power to regulate extends to the relationship of the utility to the public. The use of the "automatic cut-off" in this case falls in the latter category; and it is not a question whether new methods of furnishing service should or should not be adopted. The question is whether appellant's service, as now restricted, is adequate, reasonable, and efficient; and this can be determined only by the facts which relate to that particular service and not by comparison of use of the device under unrelated circumstances. [1] In the final order the commission said (601a) that "The record definitely shows that respondent's installation of the automatic cut-off was not motivated by a desire to eliminate interference to its subscribers, but that the device was primarily installed for the purpose of economy in the construction of the exchanges in the Johnstown area," and (616a) that "the extension of unlimited service to individual line subscribers will permit optional service to respondent's subscribers according to their need, desire and willingness to pay for the class of service." [2] The definition of a message in appellant's tariff can have no application or relevancy to the unauthorized practice of terminating telephone connections. I am in accord with what the commission said in summarizing as to this (602a) : "In either event, we find that respondent's practice of terminating telephone service is in violation of the rules and regulations of respondent as set forth in its filed and effective tariffs ......"

---

[1] This approach has been considered in the comprehensive report and order of the commission. See 611a, 612a.

[2] " 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' Mississippi Valley Barge Line Co. v. United States, 292 U. S. 282, 286, 287, 78 L. Ed. 1260, 1264, 1265, 54 S. Ct. 692; Swayne & Hoyt v. United States, 300 U. S. 297, 303 et seq., 81 L. Ed. 659, 664, 57 S. Ct. 478": Rochester Telephone Corp. v. United States et al., 307 U. S. 125, at page 146, 83 L. Ed. 1147, at page 1161.

In the instant case appellant has attempted to make its own interpretation of the scope of its rights and prerogatives in rendering service to the public, and it has acted accordingly. Such conduct, we have held, would result in the subordination of the public interest largely to a utility's discretionary action. *West Penn Rys. Co. v. Pa. P. U. C.,* 142 Pa. Superior Ct. 140, 155, 15 A. 2d 539.

It is significant that appellant, without any notice to its subscribers or to the commission either by publication or change in its tariffs, changed the unlimited service to party and individual line subscribers to a limited service with respect to the duration of the calls without any reduction in rates. In support of this action appellant contends that in this proceeding, which was upon motion of the commission and involved the service of the utility, the burden of proof was upon the commission, and in its brief says "that the Commission entirely failed to carry the burden in this case which the law places upon it." Section 420, art. 4, of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1190, reads as follows: "Burden of Proof in Proceedings Involving Service or Facilities. In any proceeding upon the motion of the commission, involving the service or facilities of any public utility, the burden of proof to show that the service and facilities involved are adequate, efficient, safe, and reasonable shall be upon the public utility."

The commission was certainly not required to approve appellant's new service, and I think it would have been fully justified in making a finding to the effect that appellant had not met its burden of proof.

The commission had before it many witnesses and numerous exhibits. After an exhaustive discussion of the evidence and the evidentiary facts, the commission found (616a) : "In view of the foregoing, we find that respondent's practice of terminating local messages to

individual line subscribers on its Johnstown exchanges is unreasonable, arbitrary and in violation of Section 401 of the Public Utility Law and that the practice of terminating local messages to party line subscribers is not unreasonable nor arbitrary and not in violation of Section 401 of the Public Utility Law for the duration of the present emergency. Accordingly, this order relates to circumstances existing at this time and we will defer the final disposition of all of the matters involved in this proceeding to such time when the present emergency has ceased." [3]

The majority opinion says that "the findings and the order of the Commission are not founded upon, nor supported by, competent evidence." The record, in my judgment, does not warrant this statement. It was voluminous, and a reasonable appraisal of the evidence indicates that it fully supported the findings and order of the commission; there was testimony both for and against the device. The final order of the commission (593a—617a) discloses that it considered all the evidence and the contentions of the parties, and sets forth the specific reasoning which led to the ultimate finding that the service of appellant is unreasonable and arbitrary. [4] I fail to see what more the commission could

---

[3] The order of the commission is as follows:

"1. That Pennsylvania Telephone Corporation, respondent, on or before December 28, 1942, file, to be effective January 1, 1943, supplements to its general tariff, Pa. P. U. C. No. 28, incorporating such changes and additions to its rules and regulations as may be necessary in order to conform with the Commission's findings herein set forth, and specifically establishing the extent of local message service, subject to automatic cut-off as rendered on respondent's Johnstown exchanges, by classes of consumers and exchange areas.

"2. That the practice of Pennsylvania Telephone Corporation in terminating local telephone conversations to individual line subscribers in its Johnstown exchanges, be discontinued from and after December 31, 1942."

[4] "In most controversies there are two types of fact questions

have done in making its findings of fact and its order, and I think the order of the commission complies with the law in every respect. See *Cage et al. v. Public Service Commission,* 125 Pa. Superior Ct. 330, 189 A. 896. "The question before the commission was largely an administrative one which must be left to the sound judgment and discretion of the commission, and its decision if based upon such substantial evidence will not be disturbed by this court unless it is so capricious, arbitrary, or unreasonable as to amount to error of law or a violation of constitutional rights. John Benkart & Sons Co. v. Pennsylvania Public Utility Commission, 137 Pa. Superior Ct. 13, 17, 7 A. 2d 588; Consolidated Edison Co. et al. v. National Labor Relations Board, 59 S. Ct. 206, 305 U. S. 197, 229, 83 L. Ed. 126, 140. We have frequently stated that this court is not a second administrative body, and that we have no power to substitute our judgment for that of the commission in the decision of such matters, and reverse the determination of the commission unless the order is capricious, arbitrary, or unreasonable, an error of law or a violation of constitutional rights. Sherman et al. v. Public Service Commission et al., 90 Pa. Superior Ct. 523, 526; Philadelphia Rural Transit Co. v. Public Service Commission, 103 Pa. Superior Ct. 256, 260, 158 A. 589. It is also provided in section 1107, art. 11, of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1437, as follows: 'The order of the com-

---

involved—questions as to evidentiary facts and questions as to ultimate facts. The first involve the 'raw elements' of the case, usually what the witnesses observed by their physical senses— what they saw, heard, and the like. The second have to do with the conclusions to be drawn from the evidentiary facts. The answers to both types, however, are determinations of fact under the accepted rule that an administrative agency's findings of fact are final if supported by substantial evidence": Fact and Law in Judicial Review, by Ray A. Brown, 56 Harvard Law Review 899, 902, May, 1943.

mission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights' ":[5] *Cole et al. v. Pennsylvania Public Utility Commission*, 146 Pa. Superior Ct. 257, at page 263, 22 A. 2d 121, at page 123.

It seems to me that the majority opinion constitutes a deviation by this court from a statutory mandate which has been frequently acknowledged—we may reverse an order only for error of law or lack of evidence to support the findings upon which the order is based (*Infantino v. Pennsylvania Public Utility Commission*, 146 Pa. Superior Ct. 245, 250, 22 A. 2d 108) ; and that the majority have substituted their judgment for that of the commission. It is the judgment of the commission and not of this court which determines whether the public interest will be served by appellant's action. As said in *American Telephone & Telegraph Co. et al. v. United States et al.*, 299 U. S. 232, at page 236, 81 L. Ed. 142, at page 147: "This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded ...... it is not enough that the prescribed system ...... shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles ......' as to be the expression of a whim rather than an exercise of judgment."

We do not sit in judgment on the commission's wisdom but only on its power. See *Kurtz v. Pittsburgh et al.*, 346 Pa. 362, 367, 31 A. 2d 257. The effect of the

---

[5] This portion of section 1107 of the Public Utility Law of 1937 has not been changed by the Act of July 3, 1941, P. L. 267, §3, 66 PS §1437.

majority opinion in reversing the commission is to subordinate the commission's jurisdiction and the public interest as determined within the commission's statutory power to the discretionary action of appellant—a public utility. If the commission under the Public Utility Law cannot deal effectively with the present problem, its usefulness as a regulatory body is seriously impaired, and adequate utility regulation is impossible.