628

Peoples Cab Co., Appellant, *v.* Pennsylvania Public Utility Commission.

Argued November 18, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

630

*Harland I. Casteel,* with him *Clyde P. Bailey, Campbell, Houck & Thomas,* and *Weller, Wicks & Wallace,* for appellant.

*Ralph S. Sapp,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for appellee, Pennsylvania Public Utility Commission.

*Gilbert Nurick,* with him *Harold E. McCamey, Dickie, McCamey, Chilcote, Reif & Robinson,* and *McNees, Wallace & Nurick,* for intervening appellee.

OPINION BY ERVIN, J., January 21, 1958:

Upon its own motion, the Commission initiated this proceeding on May 19, 1952 by an order directing "an inquiry and investigation . . . into . . . the financial condition, the operating methods, and the method of financing the acquisition of new equipment of Peoples Cab Company; and further to determine whether because of violations of the Public Utility Law the certificate of public convenience held by Peoples Cab Company should be cancelled or other penalties invoked.

The predecessor of Peoples Cab Co. (hereinafter called "Peoples") originally came into being by virtue of an order of the Commission entered February 18, 1947. Yellow Cab Company of Pittsburgh (hereinafter called "Yellow") opposed the application of Peoples before the Commission and appealed from the above order. This Court affirmed the Commission on July 17, 1947 in an opinion written by President Judge RHODES, 161 Pa. Superior Ct. 41, 54 A. 2d 301. Reference to that opinion will reveal that the quality and quantity of taxicab service then being furnished by Yellow in the City of Pittsburgh was "wholly inade-

quate to meet the demands of the public." The predecessor of Peoples became bankrupt in 1949. On March 27, 1950 the Commission approved the transfer of a certificate of public convenience from the receiver in bankruptcy to William H. Rothman. On January 8, 1951 the Commission approved the transfer of the certificate of public convenience from Rothman to Peoples. From then until May 1, 1952 Peoples operated the taxicab business in the normal, conventional manner. It suffered financial difficulties and on May 1, 1952 Peoples initiated its first driver incentive plan for the purpose of eliminating careless driving and excessive costs of operation. Peoples produced profits between the years 1952 and 1956. During this period of time the driver incentive plan was going through an evolutionary process. At the last hearings before the Commissioner in the spring of 1956, Peoples had in operation two plans. The first was a conventional one under which drivers were compensated a flat 47 per cent of fares received, had no ownership or equity in the taxicab, which was owned by Peoples, and Peoples paid all of the operating expenses. Only six of the drivers worked under this plan and they were not permitted to work during the peak period from 4:30 p.m. to 6:00 p.m. Ninety-seven men were operating under the "single incentive plan." A driver entered this plan by signing a written sales agreement in which Peoples agreed to sell to him and he agreed to buy a new taxicab. At the time of signing the purchase agreement he paid $265.00 down. Title was to be delivered to him at the end of 48 months. He had the custody of the cab and kept it at his home. Peoples could not assign his cab to any other driver. If the relationship was terminated before the end of the four-year period, he could complete purchase of the cab by making a final payment specified in a schedule con-

tained in the agreement. If he elected not to complete the purchase, he was to receive a refund during the first year of $150.00, second year $85.00, third year $57.00 and fourth year $28.00. The driver was obliged to pay to Peoples a weekly minimum "book" of $63.00 regardless of whether or not he operated his cab.[1] Peo-

---

[1] The labor agreement entered into January 30, 1956 between Peoples and District 50, United Mine Workers of America, on behalf of Local 13993, contained the following: *"Section 19—Wages* (a) Company agrees to compensate driver operating under the percentage plan 47% of his gross weekly bookings.

"(b) Company agrees to compensate driver operating under the incentive percentage plan on the following percentage basis based upon his gross weekly bookings, which percentage schedule it is mutually agreed shall be regarded as the basic weekly booking, but if booking is less it shall be computed on the same relative percentage basis:

| | | | | | |
|---|---|---|---|---|---|
| $125.00 to $129.95 | 52% | | $190.00 to $194.95 | 66½% |
| $130.00 to $134.95 | 53½% | | $195.00 to $199.95 | 67¼% |
| $135.00 to $139.95 | 55% | | $200.00 to $204.95 | 67¾% |
| $140.00 to $144.95 | 56½% | | $205.00 to $209.95 | 68½% |
| $145.00 to $149.95 | 57¾% | | $210.00 to $214.95 | 69% |
| $150.00 to $154.95 | 59% | | $215.00 to $219.95 | 69¾% |
| $155.00 to $159.95 | 60¼% | | $220.00 to $224.95 | 70¼% |
| $160.00 to $164.95 | 61¼% | | $225.00 to $229.95 | 70¾% |
| $165.00 to $169.95 | 62¼% | | $230.00 to $234.95 | 71¼% |
| $170.00 to $174.95 | 63¼% | | $235.00 to $239.95 | 71¾% |
| $175.00 to $179.95 | 64% | | $240.00 to $244.95 | 72¼% |
| $180.00 to $184.95 | 65% | | $245.00 to $249.95 | 72¾% |
| $185.00 to $189.95 | 65¾% | | $250.00 to $254.95 | 73¼% |

When Company's operating fleet of taxicabs reaches the number set forth below, the percentage compensation scale will be adjusted so as to increase the weekly compensation of driver approximately as follows:

When the number of taxicabs reaches 300     $2.50
When the number of taxicabs reaches 325     $3.00
". . .

*"Section 20—Minimum Booking*

"Each driver shall be required to maintain an average minimum book of $16.50 per day based upon a five-day work week, ex-

ples ensured that the weekly payments were paid in cash whether or not the driver operated his cab, by the following means: in addition to the weekly "book" the driver paid $1.25 per week to the sick and accident fund.[2] Peoples paid into this fund one cent per gallon of gasoline which the drivers were required to purchase from Peoples.[3] The $63.00 for the first week of illness was paid by the driver and after the first week the subsequent weekly payments of $63.00 were made to Peoples from the fund described in §§22 and 25 of the labor agreement. The drivers were required to purchase from Peoples with their own money all gasoline, tires, oil, chains, anti-freeze and repairs. Peoples sold these items to the drivers at various markups. In addition, each driver was required to pay the first

---

cept during the months of June, July and August when the same shall be reduced to $15.00 per day based upon a five-day work week. Average revenue shall at all times be not less than 16c per mile.

[2] The labor agreement contained the following: "*Section 22— Accident Fund* Each driver shall be required to pay to Company the sum of $1.25 each week, which amount shall be used to provide a $75.00 deductible collision insurance policy. Such money so collected shall be deposited in a depository and withdrawn therefrom by checks signed by a representative of Company and Union. Each driver shall be responsible for damages up to the amount of $75.00 and the above fund shall be used to cover damages in excess of the said $75.00 paid by driver."

[3] The labor agreement contained the following: "*Section 25— Sick Benefit and Accident Fund* Company agrees to deposit in the account provided for in Section 22 hereof an amount equivalent to one (1c) cent per gallon on all gasoline sold from its service station facilities and such fund shall be used to provide sick and accident benefits for all employees in the bargaining unit in a manner that may be mutually agreed upon between Company and Union from time to time. Representatives of Company and Union will meet within a period of ninety (90) days from the date hereof to determine upon a specific welfare program."

$75.00 of damage to the cab and to provide insurance for the amount of damages in excess of the first $75.00.[4]

The incentive plan has been exceedingly popular with the drivers, nearly all of whom have voluntarily chosen it. All of the evidence clearly indicates that the plan has created an incentive in the driver to carefully operate and care for his cab. Under this plan gas consumption changed from 8 miles per gallon to 12 miles per gallon; costs of parts averaged $1.95 per vehicle per month which formerly averaged $30.00 per month; the number of accidents has greatly decreased under the single incentive plan;[5] a great saving in

---

[4] The labor agreement also provided: "*Section 23—Deposits* Each 47% driver shall be required to place with Company at the time of employment a deposit of Seventy-five ($75.00) Dollars. This amount shall be held by Company and refunded to the driver thirty (30) days after the termination of employment, less any obligations due and owing by driver to company."

See also §22, note 2, supra.

[5] Mr. Fram testified as follows: "A. We started our Incentive Plan, especially our Single Incentive Plan which we felt was the pinnacle of taxicab operation in perfect performance. For the last six months of 1954, 75% of our cabs had 53% of frequency and 96% of severity in accidents. Twenty-five percent of our fleet under the Single Plan had only 7% of frequency and 4% of severity.

"In the year 1955, the full year of 1955, 72% of our cabs had 89% frequency and 97% severity.

"The Single Incentive Plan which comprised 28% of our fleet, had only 11% frequency and, astonishing as it may seem, only 3% of severity."

Letter to Mr. Fram from Maryland Indemnity & Fire Insurance Exchange, Edward Rosenberg, President, Court Square Building, Baltimore 2, Maryland, dated December 1, 1955: "This is to advise you that we have made an exhaustive and complete study of your risk for the number of years that we have carried your liability insurance.

"The most striking feature that this study has projected is the amazing decline in the accident ratio after you inaugurated your single shift operation. The proportion of accidents and the severity

of said accidents between the single and double shift operation is so overwhelming on behalf of the continuation and expansion of the single shift operation, that I felt it my duty to call this to your attention, as I believe you would be interested for the benefit of the Peoples Cab operation to give consideration to making this entire operation a single shift operation.

"I trust this letter finds you in the best of health."

Letter to Mr. Fram from Exchange Insurance Association, W. B. Shapiro, Secretary-Treasurer, 175 W. Jackson Boulevard, Chicago 4, Illinois, dated February 23, 1956: "Learning of the condition that has recently befallen your company with regard to your accident and safety record, I have taken the liberty of bringing out these certain facts and conditions that existed at the time we cancelled your insurance coverage on May 1, 1952.

"You will recall that in the early part of April, our company requested to be relieved of this risk because of the extremely high loss ratio and apparent lack of interest and safety engineering as it existed at that time.

"The loss ratio, for your information, was in excess of 80% to premiums collected, and no company writing this class of business would have accepted the risk as it was operating at that time. You will recall that an impassioned plea was made of us to remain on this risk for a fifteen day period at a 33 1/3% increase in rate, which we know was confiscatory, but was the only basis that we could justify to our underwriters remaining on this risk.

"In 1952, you explained to the writer your proposed new plan of operation through which you hoped that the insurance carrier on your risk could look to a much reduced loss ratio. In essence, the plan that you outlined was the plan known as the incentive plan. Our records have proven to us that this type of operation, from an insurance standpoint, is the most desirable. Companies operating under similar plans enjoy the lowest insurance rate brought about by low frequency of claims and less severe claims.

"Because of the changes instituted by yourself in the operation of the Peoples Cab Company, and the diligent, continuing effort exerted by yourself to make this the model cab company of the country, we are willing and most happy to insure, at this time, your risk against the hazard of Bodily Injury and Property Damage, and any other form of insurance coverage you may need at drastically reduced rates."

tires occurred under the single incentive plan.[6] Drivers operating under the single incentive plan are aware of the necessity of courteous treatment to the public and the monetary advantages in the form of generous tips arising therefrom and the advantages of operating a clean and properly maintained taxicab. The driver assists in cleaning and simonizing his cab. There is undisputed evidence in the record that operation under the single incentive plan has reduced waste and destruction and has established the lowest accident record found anywhere in the taxicab industry. Mr. Louis C. Dwyer, Supervising National Representative of International Transport Workers Union C.I.O., expressed the opinion that the single incentive plan enabled the

---

Letter to Lester J. Price, Safety Director, Peoples Cab Co., from Miss Dorothy E. Wills, Supervisor of Public Relations of Better Traffic Committee of City of Pittsburgh, 906 City-County Building, Pittsburgh, Pa., dated January 5, 1955: "The People's Cab Company is to be complimented on the fine traffic safety program conducted during the year 1954.

"The Better Traffic Committee is aware of the excellent coverage given traffic safety education both from the standpoint of training your men, the constant traffic safety reminders given them while on the job through use of your radio, and the special projects conducted to provide a greater incentive for your drivers to operate safely.

"We are particularly happy to note that 800 of your men have attended two sessions of our Traffic Safety School during the past year. This is a record of which you can be proud, and we are hopeful that other organizations will follow your lead in the traffic safety field."

[6] Mr. Fram testified: "A. During the 45% Plan it was a killing operation. Almost every day we would have a tire that was torn to shreds. The driver would ride on it while it was going flat, the driver would scrape curbs, not pull close to the pavement, in turning the corner he would hit the curb. Now with this Incentive Plan I don't believe within the last two years that we had a tire that was destroyed by negligence of the driver."

drivers to make more money than they ever did previously and resulted also in better service for the public. Notwithstanding the undisputed evidence that Peoples has increased its profits as well as the average pay of its drivers and has greatly decreased its operating costs and its accident record, the Commission has found that Peoples was improperly selling its taxicabs, gasoline, services, accessories and parts to its drivers and that the agreement with its drivers relating to the sale of taxicabs for delivery at a future date was improper. In the first two paragraphs of its final order the Commission has given the death knell to the single incentive plan. These paragraphs are as follows: "(1) That respondent pay directly all costs of performing its carrier service and cease and desist from collecting or receiving from its drivers, directly or indirectly, payments for materials, supplies, insurance and all other costs of the respondent's taxicab service.

"(2) The respondent shall enter into no agreement, arrangement or other understanding with any operator or driver whereby the operator or driver, as a condition of employment or as a condition of obtaining more favorable terms of employment, shall pay any sum to respondent on account of the purchase or use of a taxicab."

Not one witness was called from the public to show that the single incentive plan operated against the public interest. On the contrary, all of the evidence in this record clearly indicates that the service to the public has been improved by the operation of the single incentive plan. The Commission called four driver witnesses. One was employed by Peoples at the time of the hearing and three were on strike and not employed by Peoples at the time of the hearing. These three were members of Transport Workers Union. Local 278, C.I.O., an intervenor against Peoples. This

local union was bargaining agent for the employes of Peoples for a period of four years immediately preceding December 15, 1955. Thereafter a majority of Peoples' employes voted to disaffiliate with Local 278 and affiliate with District 50, United Mine Workers of America. As a result of this change, a jurisdictional strike arose between the two local unions and the three witnesses referred to above, when called to testify, were on strike. These witnesses, however, on cross-examination freely admitted that the single incentive plan of operation leads to more careful driving, reduction in accidents, proper care of equipment, reduction of repairs and parts, increased car mileage, increased gasoline mileage, reduction in driver turnover and stabilization of employment. Not one single witness even suggested that Peoples at any time under this method of operation failed to render safe, courteous, prompt and efficient transportation service to the riding public of the City of Pittsburgh. The evidence in this case does not furnish justification for the Commission's interference with the internal management of Peoples, there being nothing to show that the management was being conducted in such a manner as to adversely affect the service to the public. On the contrary, the undisputed evidence in this case reveals that the service to the public was greatly improved by the operation of the single incentive plan.

In *Northern Pa. Power Co. v. Pa. P. U. C.*, 333 Pa. 265, 267, 268, 269, 5 A. 2d 133, our Supreme Court said: "The Public Utility Commission is not a super board of directors for the public utility companies of the State and it has no right of management of them. Its sole power is to see that in the matter of rates, service and facilities, their treatment of the public is fair. Speaking through the present Chief Justice, we said: 'It is not intended by the legislature that the

commission should be a board of managers to conduct and control the affairs of public service companies, but it was meant that where certain of their powers and obligations had intimate relation to the public through fairness, accommodation or convenience, the commission should have an inquisitorial and corrective authority to regulate and control the utility in the field specifically brought within the commission's jurisdiction. . . . the company manages its own affairs to the fullest extent consistent with the protection of the public's interest, and only as to such matters is the commission authorized to intervene, and then only for the special purposes mentioned in the act': Coplay Cement Mfg. Co. v. Pub. Ser, Com., 271 Pa. 58, 61, 114 A. 649. 'It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership': Southwestern Bell Tel. Co. v. Pub. Ser. Com., 262 U. S. 276, 289.

". . . The approach of the commission to the approval or disapproval of the merger is erroneous in principle, because the question of merger is one of internal management, unless evidence heard by the commission discloses that the merger would adversely affect the public. The only question before the commission is whether it does so adversely affect, and where the testimony establishes, as it does here, that the merger would not adversely affect the public interest, the power of the commission over the merger vanishes." See also *Pa. Telephone Corp. v. P. P. U. C.*, 153 Pa. Superior Ct. 316, 324, 325, 33 A. 2d 765, where we said: "It may be conceded that, depending on the circumstances of a case, it is often difficult to draw the line between regulation which is properly the function of the Com-

mission, and management, exclusively for those charged with directing the affairs of the company. But in the present case, where no unlawful discrimination was found, we are of the opinion that the Commission over-stepped the bounds of proper regulation and assumed the role of manager in directing the change in service.

"A rule or a method is not unreasonable merely because it results in some inconvenience to a class entitled to service. And there can be no question as to the right of a telephone company doing a general public business to adopt new methods of furnishing service to its patrons if they are reasonable. Good faith is to be presumed on the part of appellant's officers and the Commission may not substitute its judgment for theirs when the choice is between two systems which provide reasonable and adequate service without discrimination." See also *Bell Tel. Co. of Pa. v. Driscoll,* 343 Pa. 109, 21 A. 2d 912; *Penn-Harris Hotel Co. v. Pa. P. U. C.,* 166 Pa. Superior Ct. 394, 71 A. 2d 853. Some cases have been cited which indicate that a few jurisdictions have frowned upon similar plans of operation. If evidence had been produced in this case to show that the operation resulted in an inferior type of service to the public, we might have done likewise. This is not such a case. We are, therefore, of the opinion that paragraphs 1 and 2 must be stricken from the Commission's order.

Paragraphs 3 and 4 of the Commission's order are as follows: "(3) Respondent shall cease and desist from the practice of allowing drivers to operate on their own schedules or preferences as to time and place of operation.

"(4) Respondent shall supervise and control regular periods of operation and shall establish places from which and areas within which its cabs shall be operated, so that a comprehensive and coordinated taxicab

service shall be inaugurated in the territory covered by its certificate." There was sufficient credible evidence in this record to justify these parts of the order. The evidence reveals that there was no regulation by Peoples of the shifts and hours for the single incentive plan driver. He could work as many days in the week and as many hours in the day, in whatever territory and at whatever hours he pleased. Single incentive drivers operated in accordance with their own individual schedules. Peoples instructed these drivers not to operate during the slow hours but only during the peak or lucrative periods. These findings are fully supported, not only by the testimony of Peoples' president but also by the testimony of the four drivers whom the Commission called. The Commission found that the resulting operation at the whim of each of the operators has failed to furnish a complete, comprehensive, co-ordinated utility service. Section 401 of the Act of May 28, 1937, P. L. 1053, 66 PS §1171, provides that the service furnished by every public utility "shall be reasonably continuous and without unreasonable interruptions or delay." Section 403 of the same act, 66 PS §1173, provides that every common carrier "shall operate its facilities with sufficient frequency, at such reasonable and proper times, and to and from such stations or points, as the commission, having regard to the accommodation, convenience, and safety of the public, may require. . . ." The legislature clearly granted to the Commission control over the times and places of operation and the distribution of facilities over the area served by the utility. It is definitely clear from the record that Peoples was taking the cream of the taxicab operation and leaving to Yellow the function of covering the slack hours. If Yellow were to follow the same course, a breakdown in the service might result. We are of the opinion that paragraphs 3 and 4 of the Commission's order should be affirmed.

Paragraph 5 of the Commission's order is as follows: "Respondent shall prepare and keep its accounts and reports in conformity with the rules and regulations of the Commission." This paragraph requires Peoples to do that which every utility in the Commonwealth must do, that is, to prepare and keep its accounts and reports in conformity with the rules and regulations of the Commission. The legislature has granted to the Commission complete power to prescribe the accounts and reports to be prepared and filed by public utilities: §§501 to 508, inclusive, of Act of May 28, 1937, P. L. 1053, 66 PS §§1211 to 1218, inclusive. It is the contention of Peoples that it has kept its accounts and reports in conformity with the rules and regulations of the Commission and that there is no evidence to the contrary in this record. If this be true, no harm will result from the affirmance of paragraph 5 of the order. We are, therefore, of the opinion that paragraph 5 should be affirmed.

Paragraphs 6 and 7 may be affirmed without comment. They are as follows: "(6) Within thirty (30) days, Respondent shall submit to the Commission a written report indicating steps taken in compliance with this order.

"(7) A copy of this order be served upon the respondent and upon the Yellow Cab Company of Pittsburgh, Taxicab Workers Local Union 218 (AFL) and Transport Workers Union, Local 278 (AFL-CIO), interveners."

To summarize, paragraphs 1 and 2 of the Commission's order of July 8, 1957 be and they are hereby stricken therefrom and paragraphs 3, 4, 5, 6 and 7 be and they are hereby affirmed.

The Commission's order of July 8, 1957 as thus modified is affirmed.