West Penn Power Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued April 5, 1984, before Judges CRAIG, BARRY and PALLADINO, sitting as a panel of three.

*Edward S. Stiteler,* for petitioner.

*Thomas J. Sniscak,* with him, *Louise Russell Knight,* Deputy Chief Counsel, *Larry Gesoff,* Assistant Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

OPINION BY JUDGE PALLADINO, July 23, 1984:

West Penn Power Company (West Penn) appeals from a decision of the Pennsylvania Public Utility Commission (PUC) which ordered West Penn to reimburse two customers for 75% of the costs of purchasing and installing isolation transformers. For the reasons set forth below, we reverse the order of the PUC.

This action arose from two complaints filed with the PUC by dairy farmers (complainants) against West Penn.[1] The complaints alleged that neutral to

---

[1] The two complaints, which were heard separately by the administrative law judge, were consolidated on appeal to the PUC.

earth voltage (stray voltage) from the neutrals on West Penn's transformer was adversely affecting complainants' cows, and was causing milk production to decrease.[2] The complaints also alleged that after West Penn had separated its neutrals from those of the complainants, the stray voltage levels had decreased. For safety reasons, West Penn would not allow the neutrals to remain separated. In order to alleviate the problem, the complainants each installed an isolation transformer, which substantially reduced the stray voltage levels. The complainants sought to have West Penn bear the costs of purchasing and installing this corrective equipment.

At the hearings before the administrative law judge (ALJ), each complainant offered testimony and documentation to establish the connection between West Penn's equipment and the stray voltage problem. West Penn offered testimony and documentation to establish that the problem was attributable to the special milking equipment on the complainants' farms. Both West Penn and the complainants agreed that only 20% of all dairy farms are affected by stray voltage, due to the location of the farms on the utility's power distribution circuit.[3]

---

[2] Stray voltage is neutral voltage which cannot return to the utility's substation through the distribution lines. Stray voltage is grounded by the utility, and travels through the earth as it returns along the distribution circuit. When the stray voltage runs through any electrical equipment, such as milking machines, it can produce low voltage electrical shock if the equipment is not properly grounded. Stray voltage may also pass through the body of a cow as part of the return circuit, depending in part on the levels of soil moisture. The wide variability of the factors influencing stray voltage contributes to the intermittent nature of the problem.

[3] Stray voltage levels are usually higher near the ends of the distribution lines. The 20% figure was taken from a survey made in Washington state.

The ALJ made twenty-five separate findings of fact, including a finding that cows are more sensitive to the presence of stray voltage than other farm animals. The ALJ concluded that the stray voltage problem is one unique to dairy farms. The ALJ also found that West Penn's use of the National Electric Safety Code as a guide for grounding its distribution circuits was reasonable. In his conclusions of law, the ALJ stated that while there is a definite need for improvement in the manner in which electric service is provided to dairy farm customers situated near the end of the distribution line, the evidence presented was "legally insufficient to prove that the service and facilities provided by [West Penn] are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of [§1501 and §1505 of the Public Utility Code (Code), 66 Pa. C. S. §1501 and §1505]." The ALJ dismissed both complaints, but also recommended that the PUC conduct an informal investigation to determine the extent of the stray voltage problem in the delivery of electrical service to dairy farms in Pennsylvania.

On appeal, the PUC adopted the ALJ's findings of fact, but held that the complainants had sustained their burden of proof, and sustained the complaints in part. In its opinion, the PUC noted that the record was clear that the stray voltage problem was not universal with all dairy farmers, but that in this particular case the complainants had received an excessive level of stray voltage. Because the cost of determining the source of the stray voltage would exceed the cost of on site correction of the problem, the PUC ordered that the parties must share in the responsibility of reducing the levels of stray voltage on complainants' farms. The record established that the most significant decrease in the voltage levels occurred when the physical

connections between West Penn's grounding system and complainants' grounding system were broken (either through separation of the neutrals or the installation of the isolation transformers), so the PUC ordered that West Penn reimburse 75% of Complainants' costs for purchasing and installing the corrective equipment. The PUC additionally stated that West Penn should establish the necessary tariff rules and regulations, including a 25% contribution in aid of construction, and minimum bill provisions to enable the company to recover its investment in the corrective equipment over the useful life of the equipment. The PUC ordered that the implementation of these measures was to be postponed until the survey suggested by the ALJ was complete.

The PUC specifically stated that its decision should *not* be interpreted as a finding that West Penn had rendered inadequate or unreasonable service in contravention of its duty under §1501 of the Code. The order is to be interpreted as "merely a policy decision regarding the allocation of the costs of installing isolation transformers under the facts and circumstances of these particular cases."

West Penn has raised three issues in this appeal: 1) whether the PUC may impose the costs of installing equipment on a utility where there is no violation of the utility's duty under §1501 of the Code; 2) whether the PUC may order an allocation of these costs without a specific grant of authority to allocate under §1501; 3) whether the allocation of costs constitutes an unreasonable preference under §1505 of the Code.[4]

---

[4] Our scope of review of a PUC adjudication is limited to determining whether constitutional rights were violated, an error of law was committed or findings of fact were unsupported by substantial evidence. *Mill v. Pennsylvania Public Utility Comm'n*, 67 Pa. Commonwealth Ct. 597, 447 A.2d 1100 (1982).

162

Section 1501 states in part that:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

This section sets forth the utility's duties to its customers, and is the basis of the complaints filed in this case. We hold that in order for the PUC to sustain a complaint brought under this section, the utility must be in violation of its duty under this section. Without such a violation by the utility, the PUC does not have the authority, when acting on a customer's complaint, to require any action by the utility.[5]

We are presented in this case with two inconsistent statements in the decision of the PUC. While initially stating that the complainants had met their burden of proof, and so sustaining the complaints in part, the decision goes on to state that this was not to be interpreted as a finding that West Penn had breached its duty under §1501.

Because the PUC specifically stated that West Penn has not contravened its duty, it cannot sustain

---

[5] See Reynolds Disposal Co. v. Pennsylvania Public Utility Comm'n, 79 Pa. Commonwealth Ct. 222, 468 A.2d 1179 (1983). See generally Peoples Cab Co. v. Pennsylvania Public Utility Comm'n, 185 Pa. Superior Ct. 628, 137 A.2d 873 (1958) (holding that the PUC does not have the authority to regulate or control the management decisions of a utility absent a finding that the management decision would adversely affect the public) ; Philadelphia Suburban Water Co. v. Feinstein, 34 Pa. Commonwealth Ct. 516, 383 A.2d 997 (1978) (holding that the PUC may not allocate the amount of a disputed water bill between the utility and the customer where the complainants had not met their burden of proof).

the complaints, either in whole or in part. Therefore, we must reverse that portion of the PUC's order which sustains the complaints in part and orders West Penn to pay 75% of the costs for the isolation transformers to each complainant.[6]

ORDER

AND Now, July 23, 1984, the portion of the order of the Pennsylvania Public Utility Commission entered March 8, 1983, at Complaint Docket Nos. C-812-806 and C-822897, sustaining the complaints in part is reversed and the complaints are dismissed.

Judge BARRY dissents.

---

[6] Because of our disposition of the case on the first issue, we do not address the issues of whether the PUC can allocate costs in this situation, or whether the decision would constitute an unreasonable preference in violation of §1505 of the Code.