**Adolph FRAM, Plaintiff,**

**v.**

**YELLOW CAB COMPANY OF PITTSBURGH, a corporation, Defendant.**

**Civ. A. No. 71–550.**

United States District Court, W. D. Pennsylvania.

July 26, 1974.

Harry Alan Sherman, Pittsburgh, Pa., for plaintiff.

Robert S. Grigsby, Pittsburgh, Pa., for defendant.

## OPINION

SCALERA, District Judge.

I

This is a diversity action brought by Adolph Fram, who, at the time of the filing of the complaint, was president of the Peoples Cab Company of Pittsburgh, against the Yellow Cab Company of Pittsburgh for an alleged defamation which occurred on the July 23, 1970 televising of the news program "Newsroom" broadcast over Pittsburgh's public television station WQED.[1] The allegedly slanderous remarks were made on the program by defendant's counsel, David J. Armstrong, in an interview with John Roberts, a member of WQED's "Newsroom" staff. At the request of Armstrong or defendant, Yellow Cab, Armstrong appeared on behalf of the defendant[2] on "Newsroom" in order to respond to some of the comments made by Fram, who had appeared on the preceding night's edition, July 22, 1970, of "Newsroom."[3]

Defendant has filed a motion for summary judgment, Rule 56 of Federal Rules of Civil Procedure. Affidavits and briefs have been submitted. Plaintiff attached a copy of the "Newsroom" transcript of July 23, 1970 to his complaint. Order, records and opinions of the Pennsylvania Public Utility Commis-

sion, the Superior Court of Pennsylvania, and the City Council of Pittsburgh have been appended to Armstrong's affidavit.

II

In order to understand the context in which the claimed defamatory remarks were made by Armstrong on the July 23, 1970 televising of "Newsroom," a history of the relevant dates and events in this taxicab controversy involving Peoples Cab, Yellow Cab, and the Pennsylvania P.U.C. is essential. The plaintiff himself recognizes that a controversy has existed for many years between Peoples Cab, led by Fram, and Yellow Cab. Deposition, pp. 184–186. In this regard, the parties have supplied the court with copies of many records which document the history of this taxicab controversy. Using these papers, which include orders entered by the P.U.C., the opinions of the Pennsylvania Superior Court, the records of this court, and the hearings before City Council, the court has assembled the following history to illuminate the action *sub judice*:

A. *The Peoples Cab Company and the Pennsylvania Public Utility Commission*

On January 28, 1968, the P.U.C. by its own motion ordered an investigation into the management of Peoples Cab

---

1. Defendant, Yellow Cab, in its answer, specifically raises the defense that this court lacks jurisdiction because there is no diversity of citizenship between the parties. However, Yellow Cab believes its motion for summary judgment to be so persuasive that it does not press this defense for consideration. The court, therefore, will not consider the diversity defense in its determination of the motion. We note, however, that in his complaint, plaintiff avers that he was a resident of Pennsylvania but at the time of filing this action he had become a resident of Baltimore, Maryland. Fram claimed that he and his wife took up residence in Baltimore with his mother-in-law in April of 1971. Deposition, p. 267. Plaintiff also produced evidence of a Maryland voter registration card dated May 20, 1971. Deposition, p. 7. Fram did indicate that he and his wife regularly returned to Pittsburgh after May of 1971 to do work for Peoples Cab, during

which time they stayed with a friend. Deposition, pp. 64–65.

2. Plaintiff alleges that Armstrong was speaking as an agent for the defendant when he appeared on "Newsroom." Defendant, although it raises the defense of the lack of agency on the basis that Armstrong did not have the authority to utter these statements on behalf of Yellow Cab, does not pursue this defense in its motion for summary judgment. And, accordingly, we will not consider it in our determination of the summary judgment issue.
 The court relies on the transcript of "Newsroom" of July 23, 1970, which both parties agree is an accurate one, for the fact that Yellow Cab and/or Armstrong requested an appearance on "Newsroom." The entire transcript has been included in this opinion beginning at p. 8.

3. See transcript included in this opinion beginning at p. 8.

Company. It should be noted that an order by the P.U.C. in July, 1957 based on a previous investigation was appealed by Peoples Cab to the Superior Court of Pennsylvania. That court in Peoples Cab Co. v. Pennsylvania Public Utility Commission, 185 Pa.Super. 628, 137 A. 2d 873, affirmed that portion of the P. U.C.'s order which disallowed Peoples' practice of having its drivers operate on their own personal schedules. The Superior Court ruled that the company should desist from the practice of allowing drivers to choose the time and place of their operation, and that Peoples should supervise and control the periods of operation and the areas within which its cabs operated to the end that a coordinated utility service will be maintained in its certificated territory. P.U.C.'s Investigation Docket No. 92, May 27, 1969.[4]

Proceeding with the investigation of Peoples Cab, the Commission on February 13, 1968 held a hearing in Pittsburgh at which a P.U.C. examiner presided. The testimony taken at this hearing indicated that Peoples Cab was in violation of the prior Superior Court ruling of January 21, 1958 and that Peoples' operational practices were violating Rule 15, Part IV of the P.U.C.'s Supplemental Taxicab Regulations.[5]

On April 25, 1968, another hearing was held in Harrisburg by the P.U.C.

At this hearing, the Chairman of the P. U.C., George I. Bloom, appeared as a witness, so Bloom recused himself completely from this investigation. Bloom denied that he had ever told Fram or Peoples Cab that their leasing plan would not have to comply with Rule 15; rather, Bloom testified that he told Fram that his plan of leasing taxis to his drivers and calling them independent contractors was illegal and a violation of the P.U.C.'s regulation.[6] (P.U.C. Investigation Docket No. 92, p. 2.)

Following the hearings and investigation, the Commission in its order of May 27, 1969 found: (1) that Peoples Cab was in violation of Part IV, § 15 of the P.U.C.'s Supplemental Taxicab Regulations and the state's public utility law by its leasing operation system;[7] (2) Peoples Cab to be in violation of the Commission's prior order and the Superior Court's prior order of January 21, 1958 (185 Pa.Super. 628, 137 A.2d 873), in that the testimony showed that Peoples was again permitting its drivers to choose their own working hours and their working territories solely on the basis of an individual driver's personal decision. The P.U.C. then concluded its order by rescinding Peoples' certificate of public convenience effective July 28, 1969, unless prior thereto Peoples revised its operations so as to correct the two violations. (P.U.C. Investigation Docket No. 92, p. 5–6.)

4. During all the time covered in this history, Fram was president of Peoples Cab.

5. Rule 15, Part IV of the Commission's Taxicab Regulations provides:
"Every vehicle operated as a taxicab shall be owned by and registered in the name of the certificated holder. No vehicle shall be operated except by the certificated holder or the employees of the certificated holder. Taxicab operation and service shall be under the direct control and supervision of the certificated holder."

6. This incident between Fram and Bloom resulted in a civil rights suit that was filed in this court. In Peoples Cab Co. v. Bloom, 330 F.Supp. 1235, D.C., the plaintiffs alleged that Bloom had conspired with an officer of Yellow Cab and representatives of Yellow Cab's parent company, Checker Motors, to reestablish Yellow Cab as a taxicab

monopoly within Pittsburgh and to destroy the plaintiff's taxicab company. This civil rights suit was dismissed pursuant to Rule 12(b)(1) and (6), Fed.R.Civ.P., by the opinion and order of Chief Judge Rabe F. Marsh on August 17, 1971. The Court of Appeals for the Third Circuit affirmed in No. 71–1989 on October 20, 1972, 472 F.2d 163.

7. The Commission found that Peoples Cab's lessor-lessee plan of operation consisted of the following: a lease agreement is entered into between the lessor, Peoples, and the lessee, the individual driver. Pursuant to the lease agreement, lessor agrees to lease to the lessee a taxicab which lessee shall operate as an independent contractor. Lessee was responsible for all tax liabilities, and further agreed to pay Peoples a fixed rental for use of the cab plus the cost for all gasoline consumed.

On December 11, 1969, the Superior Court at 216 Pa.Super. 18, 260 A.2d 490, specifically affirmed the findings of the P.U.C. stating, "Certainly, Peoples' mode of operation in flagrant disregard and defiance of the earlier order constituted willful disobedience of both the Commission and this Court. Peoples, in effect, sought to arrogate to itself powers and privileges specifically denied it in the earlier case." 260 A.2d at 492.

With reference to the P.U.C.'s finding on the leasing arrangement, the Superior Court decided that it need not rule upon it: "While the Commission's opinion indicates disapproval of the plan, it appears clear that the actual order entered is based solely on Peoples' failure to regulate and supervise its drivers. Whether the Commission would maintain the same opinion as to the lease plan if this feature were removed from it, however, is not a matter for speculation by us at this time." 260 A.2d at 492.

### B. Yellow Cab's Fare Increase

On September 12, 1969, Yellow Cab filed an application for a fare increase with the P.U.C.

Approximately two weeks later, on September 29, 1969, Fram, on behalf of Peoples Cab, filed a complaint at C. 18809 on the Commission's Complaint Docket, asking that the Yellow Cab fare increase be deferred until after public hearings.

Meanwhile, the Commission on the very same day had determined on the basis of the financial and other data filed by Yellow Cab with the application not to suspend the application for Yellow Cab's increased rates, thereby, permitting the fare hike to become effective on October 12, 1969.

On the 15th of October, 1969, Fram appeared before Pittsburgh City Council to request it to petition the P.U.C. for a public hearing on Yellow Cab's approved fare increase.

After several postponements, on July 22, 1970 in Pittsburgh, a hearing was held by the P.U.C. on People's complaint against Yellow Cab. The Commission noted that in this type of rate proceeding, the burden is on the respondent, Yellow Cab, to sustain the rate increase. Peoples Cab, the complainant, appeared at the hearing with counsel and requested a continuance of the hearing so that Peoples could examine the financial and supporting data filed by Yellow Cab in support of its fare increase. The Commission's examiner denied Peoples the continuance because Peoples had had an opportunity for over ten months to examine the Commission's files and prepare its case.

On the evening of July 22, 1970, plaintiff Fram, as the spokesman for Peoples Cab, appeared on "Newsroom" and was interviewed by WQED's John Roberts and Bill Banks, both regular members of "Newsroom" staff. In the course of Fram's interview, he freely and vigorously criticized the P.U.C. and Yellow Cab Company. Fram alleged that Yellow Cab's form of self-insurance was inadequate to cover its fleet of cabs and that the P.U.C. had been trying for twenty-one years to put Peoples Cab out of business so that Yellow Cab could enjoy a monopoly on the taxicab business in the Pittsburgh area. In general, Fram's comments denounced Yellow Cab as a company whose only concern was its increased profits and that Yellow Cab, because of its monopoly on taxicab service in Pittsburgh, would soon charge the public exorbitant fares.[8]

---

8. The portion of the July 22, 1970 transcript tape in which Fram spoke is not available in its complete form. At the deposition of "*Newsroom*" commentator, John Roberts, it was discovered that the portion of the July 22nd tape containing Fram's comments had been taped over with other material, thereby erasing completely the plaintiff's comments. Roberts stated that the erasure was com-

pletely contrary to WQED's usual procedure of taping every show for the station's official file immediately after the program has been televised. The commentator said he believed that the erasure of Fram's comments was done by someone who had gained unauthorized use of the station's tape. However, in the transcript of the July 23, 1970 "Newsroom," reference is made to ex-

In order to respond to plaintiff's remarks, Armstrong appeared on the July 23, 1970 "Newsroom." Although plaintiff in his deposition specifically designates which portions of Armstrong's comments he believes to be defamatory of him, the vast number of the claimed defamatory statements and the necessity of reading these allegedly defamatory remarks in the context in which they were said, requires us to set forth in full the transcript of the remarks of Armstrong and the questions put to him on "Newsroom."

JOHN ROBERTS INTERVIEW OF DAVID ARMSTRONG, ATTORNEY FOR YELLOW CAB COMPANY, SHOWN ON WQED—JULY 23, 1970

John Roberts:

Last night, if you were in Newsroom, you saw a man whose name is Adolph Fram. Mr. Adolph Fram is the President of the Peoples Cab Co. He appeared in Newsroom and answered charges which were made by the Public Utility Commission here in Pennsylvania. The P.U.C. and among other things, the P.U.C. thinks that Peoples license should be revoked because they are violating things.

(An excerpt from the video tape made the previous evening, July 22, 1970, is then shown.)

The following is the portion of the tape shown on July 23, 1970:

Adolph Fram:

This is just a sham to cover up the real battle. . .

John Roberts:

Sham, by whom, the P.U.C.?

Adolph Fram:

By both the P.U.C. and the Yellow Cab Company in order to provide rate increases to the Yellow Cab. Co.

John Roberts:

Well, isn't the P.U.C. supposed to operate in the interest of the Public? How? How?

Adolph Fram:

I don't know. I don't know. Why, when one of the other utilities. Duquesne Light, Equitable Gas or the Telephone Company desires to raise their rates 3% or 5%, is there much hullabaloo? But when the Yellow Cab Co. wants to raise its rates by 33⅓%, no one knows about it; and on October 12, this is exactly what happened to the City of Pittsburgh. I addressed Council, City Council, on October 15, three days later and not one member of the City Council, not one member of the nine, even knew that the Yellow Cab Co. had raised its rates by 33⅓%.

(End video tape)

John Roberts:

Well, that was a video tape of the late broadcast of what Adolph Fram, President of Peoples Cab had to say last night. And, in the Newsroom tonight, I would say at his request, at least Yellow Cab's request, is David Armstrong, the attorney, legal counsel, for Yellow Cab, who said that he would like an opportunity to reply to some of the things said by Mr. Fram. So, welcome to the Newsroom, David Armstrong, and please reply.

David Armstrong:

Thank you. I would like to say at the outset that the impression that's created, at least to me, by Mr. Fram's remarks and his testimony yesterday at the Hearing is that there is a application pending now for an increase; and that's not true. The increase being referred to actually went into effect in October of 1969. It was applied for by Yellow Cab in September of 69, studied by the P.U.C., and it was approved in October. And at this late date, Mr. Fram, as president of Peoples Cab, now takes it upon himself to raise this ques-

cerpts from the video tape of the previous night's program on which Fram appeared. These excerpts of Fram's more critical allegations provide an adequate basis for the

factual conclusions above. And we again note that both parties have agreed to the accuracy of the July 23, 1970 transcript.

tion. Some of the other things that he mentioned last evening that I would like to correct the record on, although I can't correct it on all of them, there isn't that much time, but a few of the high points, for example, concern insurance. He stated or implied that Yellow . . . .

John Roberts:

We have a video tape of that. I don't mean to interrupt you, but let's really get his direct quote, verbatim, and go to video tape. Bill Banks asked Mr. Fram about the question of insurance protection and Fram had this to say:

(Video tape then shown)

The following is that portion of the tape shown as this spot.

Bill Banks:

One of the subjects that the Commissioners didn't permit you to go into day and you told me later which was very important was the insurance set-up that Yellow Cab has.

Adolph Fram:

Right. The Yellow Cab Company is self-insured and I think it's dangerous because that isn't adequate. The amount that they have isn't adequate to cover the Yellow Cab Company's 400 and some taxicabs.

John Roberts:

Mr. Fram, you make it sound as if the P.U.C. is out to get the Peoples Cab.

Adolph Fram:

Right. The P.U.C. has been trying for 21 years to put the Peoples Cab Co. out of business . . .

Stein:

Why?

Adolph Fram:

So that the Yellow Cab Company can regain its monopoly. I don't know why. All we do is fight. It's their fight against us. And what we do is try to resist to the best of our ability. Now if the cab company is put out of business, Peoples Cab, and Yellow is permitted to regain its monopoly, you won't pay $8.50 to ride from the Airport to Oakland, as presently. Incidentally, our rates did not change. Our rates are $6.50. There is a $2.00 differential now. But, if Yellow regains its monopoly, the people of the City of Pittsburgh will pay $15.00 from the Airport to the City.

(End video tape)

John Roberts:

Now, again, that was taped as of last night's Newsroom. And, so we did hear, Mr. Armstrong, verbatim, what Fram said. So, expound, if you will.

David Armstrong:

Well, let me work my way back a bit. First, on this $15.00 affair to the Airport, that's ridiculous. That's more of Mr. Fram's fantasy rather than fact, which he is highly accustomed. Then, dealing with the matter of the Yellow Cab attempting to put him out of business, that's also completely false. His fight is with the P.U.C., which, as I understand it, Yellow Cab not being a party to any of those proceedings, has determined that Mr. Fram and the Peoples Cab Co. are operating in an illegal manner. They are operating outside of the law and contrary to the regulations and they have been ordered just this week to show cause why their certificate should not be revoked. And, getting finally where we started, to the point of insurance, again his assertion that we have no insurance is totally inaccurate and I think he knows that. Yellow Cab has always had insurance for very, very high limits. We do have an exempted amount, the first amount of the claim is self-insured because Yellow Cab pledges its ample assets to pay any such claims and because the Commission oversees the reserves and has determined this is safe. And, beyond that amount, we are insured by such companies as Lloyd's of London. And the Transportation Insurance Company is very large and financially sound.

John Roberts:

Mr. Fram did suggest at least that the P.U.C. and Yellow, the P.U.C. might be trying to put Peoples out of business, in

order to benefit Yellow Cab. Now, what's your reaction to that bit?

David Armstrong:

Well, ha, that sounds to me a little bit like the sort of paranoid thinking that you get from a schizophrenic, where one is suspicious of everyone else around him because he, himself, doesn't conform to the standards of conduct required. Now, he is in violation of the law, and as I understand the case, the P.U.C. found that in his operating his company by leasing vehicles to drivers that's not subject to control of the commission and who could drive when they wanted to and sort of skim the cream and not cover the difficult areas or the difficult times and not in any way be subject to the safety standards with control or any other requirements of the P.U.C. They found that this type of operation is contrary to law and the Superior Court of Pennsylvania has affirmed that decision. Nevertheless. . . .

Bill Banks:

Excuse me. The Superior Court (cough) excuse me, Mr. Armstrong, accusation has been made which is not conviction. Superior Court, has it indeed actually made a finding in this case?

David Armstrong:

Yes. It has definitely made a finding in the case. Mr. Fram said last night that the Superior Court had not ruled upon the way he operated his company. That is, again, not correct. The P.U.C. ordered him to cease his manner of operation last summer. He appealed to the Superior Court. This case was heard late in the Fall and sometime in the winter, the Superior Court rules that his operation, his manner of operation, was illegal and in turn the Commission ordered him to cease and now the Commission has apparently found that he hasn't changed his manner of operation at all.

John Roberts:

Mr. Armstrong, all the state utility commissions do not act similarly and you know that. You have a place like Washington, D.C., and there are hundreds of cab companies, some of which have one cab. I've ridden in them. They're not bad and they look safe, air-conditioned, and so on. Is it truly in the interest of the public that in Pittsburgh we have only two, or possibly if the P.U.C. gets its way, one cab company in Pittsburgh?

David Armstrong:

Well, I don't think it's correct that the P.U.C. wants to have one cab company in Pittsburgh. The P.U.C. will have as many competent, capable cab companies as can and do apply and get a certificate. There are a number of cab companies in the metropolitan area, 15 or 20 of them in the area covered by Yellow Cab. Whether philosophical, philosophically, there is any advantage to having an individual person or taxi licensed, I can't really answer that. I think the Commission is in the best position to do so and they have said "no" that it is not if that person is not even subject to its direct control.

John Roberts:

How about asking this to wrap up this session. Are you satisfied that you have had fair opportunity to respond to Mr. Fram?

David Armstrong:

Well, I could take one moment more to cover two additional points. He indicated that we have a 33% increase, when actually the increase, as it works out, is a 20% increase because the first 50 cents has not been changed. And, secondly, he mentioned other cities throughout the United States. I checked the statistics today of the International Taxicab Association and they show conclusively that in the top 50 cities in the United States there are only 9 cities with lower fares than Yellow Cab of Pittsburgh. There are some 18 cities with the same fare and there are 23 cities with higher fares than our own.

Bill Banks:

Let me ask you one more question. The heart of the complaint from Yellow Cab and from the P.U.C. is the lease arrangement which is used by the Peoples

Cab Co., which is also used by Parmalee, your parent corporation, in a number of different cities, but why can Peoples Cab operate more economically for the public than Yellow

David Armstrong:

First, Parmalee is not the parent company, it's Checker Motor Corporation. Parmalee does not operate lease. . . .

Bill Banks:

In Chicago. . . .

David Armstrong:

No. That is not correct. They do not. I know Mr. Fram contends that, but that is not accurate, no. What was the point of your question?

Bill Banks:

Why can Peoples . . . why has Peoples not requested an increase in their rates? Why are they satisfied at the rates that they are working with and Yellow has had to demand or request an increase to the public?

David Armstrong:

Well, that's a great mystery to me because Mr. Fram told you last night, you so reported, that when I charged him yesterday with paying no Pennsylvania income tax, he replied to you that he didn't because Peoples had no income, and I . . . . .

Bill Banks:

Had no profit.

David Armstrong:

Well, net income, no profit. I assumed that he needs it actually. The only way he could make his illegal operation work is to live off of the drivers who will not earn anything in this type of operation, who will leave and there will be a constant turnover of inexperienced and incompetent, incapable drivers, while Mr. Fram, because his charges to them to lease the vehicle will be such that he will be the only one who profits by it.

John Roberts:

Mr. Armstrong, I'll try it with a yes or no answer. Do you think in the public interest and certainly we do not have any rapid transit or even total mass transit system here that a confrontation in Newsroom between you and Mr. Fram would serve any purpose in the public interest?

David Armstrong:

Well, no. I think outside of the courtroom, a confrontation with Mr. Fram never serves any purpose because I think without the Rules of Evidence, and the strict application of them, it is too difficult to keep swatting down the things that he raises. (Laugh).

John Roberts:

Thanks very much, David Armstrong, attorney legal counsel, for Yellow Cab, at his request appearing in Newsroom tonight to react to statements made last night by Adolph Fram of Peoples Cab.

### III

Plaintiff's complaint does not recite the particular defamatory statements which are the basis of this lawsuit. However, in plaintiff's exhaustive deposition, defense counsel had Fram specifically cite the 19 passages from WQED's transcript where Fram believes that Armstrong has defamed him.

The allegedly defamatory statements by Armstrong:

1. . . . the impression that's created, at least to me, by Mr. Fram's remarks and his testimony yesterday at the hearing in that there is an application pending now for an increase, and that's not true. The increase being referred to actually went into effect in October of 1969. (WQED transcript (Tr.), p. 9; Fram depo., p. 109)

2. And at this late date, Mr. Fram, as president of Peoples Cab, now takes it upon himself to raise this question. (WQED Tr. p. 9; Fram Depo. p. 118)

3. First, on this $15.00 fare to the Airport, that's ridiculous. That's more of Mr. Fram's fantasy rather than fact, which he is highly accustomed. (WQED Tra. p. 10; Fram depo. p. 133)

4. Then, dealing with the matter of the Yellow Cab attempting to put him out of business, that's also completely

false. (WQED Tra. p. 10; Fram depo. p. 136)

5. His fight is with the P.U.C. (WQED Tra. p. 10; Fram depo. p. 147)

6. Mr. Fram and the Peoples Cab Company are operating in an illegal manner. (WQED Tr. p. 10; Fram depo. p. 148)

7. . . . again his (Fram's) assertion that we have no insurance is totally inaccurate and I think he knows that. (WQED Tr. p. 10; Fram depo. p. 156)

8. . . . the Commission (P.U.C. oversees the reserves (Yellow Cab's) and has determined this is safe. And beyond that amount, we are insured by such companies as Lloyds of London. And the Transportation Insurance Company is very large and financially sound. (WQED Tr. p. 11; Fram depo. p. 210)

9. Well, ha, that sounds to me a little bit like the sort of paranoid thinking that you get from a schizophrenic, where one is suspicious of everyone else around him because he, himself, doesn't conform to the standards of conduct required. (WQED Tr. 11; Fram depo. p. 211)

10. . . . he (Fram) is in violation of the law . . . . (WQED Tr. p. 11; Fram depo. p. 212–213)

11. . . . as I understand the case, the P.U.C. found that in his operating his company by leasing vehicles to drivers that's not subject to control of the commission and who could drive when they wanted to and sort of skim the cream and not cover the difficult areas or the difficult times and not in any way be subject to the safety standards with control or any other requirements of the P.U.C. (WQED Tr. p. 11; Fram depo. p. 214–215).

12. They (the P.U.C.) found this type of operation is contrary to law, and the Superior Court has affirmed that decision. (WQED Tr. p. 11; Fram depo., p. 215)

13. Mr. Fram said last night that the Superior Court had not ruled upon the way he operated his company. That is, again, not correct. (WQED Tr. p. 11; Fram depo. p. 216)

14. Well, I don't think it is correct that the P.U.C. wants to have one cab company in Pittsburgh. The P.U.C. will have as many competent, capable cab companies as can and do apply and get a certificate. There are a number of cab companies in the metropolitan area, fifteen or twenty of them in the area covered by Yellow Cab. Whether philosophical, philosophically, there is any advantage to having an individual person or taxi licensed, I can't really answer that. I think the Commission is in the best position to do so and they have said 'no,' that is not if that person is not even subject to its direct control. WQED Tr. p. 12; Fram depo. p. 217–218)

15. He (Fram) indicated that we have a 33% increase, when actually the increase, as it works out, is a 20% increase because the first 50 cents has not been changed. (WQED Tr. p. 12; Fram depo. p. 218)

16. And, secondly, he (Fram) mentioned other cities throughout the United States. I checked the statistics today of the International Taxicab Association and they show conclusively that in the top 50 cities in the United States there are only 9 cities with lower fares then Yellow Cab of Pittsburgh. There are some 18 cities with the same fare and there are 23 cities with higher fares than our own. (WQED Tr. 12; Fram depo. p. 219)

17. Well, that's a great mystery to me because Mr. Fram told you last night, you so reported, that when I charged him yesterday with paying no Pennsylvania income tax, he replied to you that he didn't because Peoples had no income . . . . (WQED Tr. 13; Fram depo. p. 219–220)

18. The only way he could make his illegal operation work is to live off of

the drivers who will not earn anything in this type of operation, who will leave and there will be a constant turnover of inexperienced and incompetent, incapable drivers, while Mr. Fram, because his charges to them to lease the vehicle will be such that he will be the only one who profits by it. (WQED Tr. p. 13; Fram depo. p. 220–221)

19. I think outside of the court room a confrontation with Mr. Fram never serves any purpose, because I think without the rules of evidence and the strict application of them, it would be too difficult to keep swatting down the things that he raises. (WQED Tr. p. 13; Fram depo. p. 223)

## IV

In this diversity action, the Pennsylvania substantive law governs. Plaintiff avers that although he had been a resident of Pennsylvania, he had at the time of filing this action become a resident of Maryland. The defendant is a Pennsylvania corporation.

 Pennsylvania law provides that "a communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962); Birl v. Phila. Elec. Co., 402 Pa. 297, 303, 167 A.2d 472 (1960); Restatement (First) of Torts § 559 (1938). We note that "slander" is the general and original word for all kinds of defamation. Williams v. Kroger Gro-

cery & Baking Co., 133 Pa.Super. 1, 1 A.2d 495, 498 n. 1 (1938), aff'd 337 Pa. 17, 10 A.2d 8 (1940). "However, in modern usage it has been limited to defamation by words spoken rather than written, that is, to the speaking of base and defamatory words which tend to prejudice another's reputation, office, trade, business, or means of making a living." Quinones v. United States, 492 F.2d 1269, 1274 (3d Cir. 1974). Generally, to state a cause of action for defamation in Pennsylvania, the plaintiff must allege the defamatory character of the communication, publication, that the communication refers to the plaintiff, the third party's understanding of the communication's defamatory character and its reference to the plaintiff, and injury. Corabi v. Curtis Publishing Company, 441 Pa. 432, 273 A.2d 899 (1971); Cosgrove Studio and Camera Shop, Inc. v. Pane, supra, 182 A.2d 751.

To codify the cause of action, Pennsylvania has enacted a statute (Act 1953 August 21, P.L. 1291, 12 P.S. § 1584a)[9] on defamation actions which verbatim tracks the Restatement (First) of Torts' provisions on burden of proof, and which places the burden of proof for the affirmative defense of truth and privilege upon the defendant.

 It is the function of the court, in the first instance, to determine as a matter of law whether the statements complained of are capable of defamatory meaning. Corabi v. Curtis Publishing Co., supra; Sellers v. Time, Inc., 423 F.2d 887 (3d Cir.), cert. denied 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970); Sarkees v. Warner-West Corp., 349 Pa.

---

9. "§ 1584a. Burden of proof

(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
(a) The defamatory character of the communication;
(b) Its publication by the defendant;
(c) Its application to the plaintiff;
(d) The recipient's understanding of its defamatory meaning;
(e) The recipient's understanding of it as intended to be applied to the plaintiff;
(f) Special harm resulting to the plaintiff from its publication;

(g) Abuse of a conditionally privileged occasion.

(2) In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:
(a) The truth of the defamatory communication;
(b) The privileged character of the occasion on which it was published;
(c) The character of the subject matter of defamatory comment as of public concern. 1953, Aug. 21, P.L.1291, § 1."

365, 37 A.2d 544 (1944); Scott-Taylor, Inc. v. Stokes, 425 Pa. 426, 229 A.2d 733 (1967).

■ The distinction between whether a communication is defamatory (clearly a question for the jury under Pennsylvania law) and whether a communication is capable of a defamatory meaning as a matter of law for the trial court in the first instance, is fundamental. Sellers v. Time, Inc., supra, 423 F.2d at 889. In this regard the Pennsylvania Supreme Court in Scott-Taylor, Inc. v. Stokes, supra, 229 A.2d at 734, said that while a statement may be personally annoying or embarassing, annoyance does not constitute defamation; to be capable of defamatory meaning a statement must impart the kind of harm that "grievously fractures the plaintiff's standing in the community of respectable society."

■ This court's determination as to which of the nineteen specified remarks is capable of a defamatory meaning must consider that Pennsylvania law mandates that to prevent a chilling effect on free speech, "statements which represent differences of opinion or are annoying or embarrassing, are, without more, not libelous." Bogash v. Elkins, 405 Pa. 437, 440, 176 A.2d 677, 679 (1962).

■ The case of Redding v. Carlton, 223 Pa.Super. 136, 296 A.2d 880 (1972) further cautions that a publication is not capable of defamatory meaning where its meaning is "no more than rhetorical hyperbole" or "a vigorous epithet." In Redding, supra, the plaintiff

was a township supervisor and the owner of property situated near the vicinity of the proposed site for that township's new headquarters. The defendants launched a campaign to prevent the purchase of the new site, alleging that plaintiff's dual role as supervisor and property owner constituted a "conflict of interest at the very least, and perhaps much more." The allegations also charged that plaintiff's land adjoined the proposed site (plaintiff's property was actually near but not adjacent to the proposed site) and that the costs for the proposed site were deliberately understated. The Superior Court, relying on Greenbelt Cooperative Publishing Ass'n, v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970),[10] decided that the statement about plaintiff's land was a minor misstatement analogous to a "rhetorical hyperbole" or "vigorous epithet" which is incapable of a defamatory meaning.

We are further guided by Pennsylvania law which states that "to be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect." Restatement (First) of Torts § 569, comment d (1938). See also, Miller v. Hubbard, 205 Pa.Super. 111, 207 A.2d 913 (1965).

■■ In determining whether these nineteen statements by Armstrong are capable of being defamatory of Fram, this court must read the statements of Armstrong in the context in which they

10. "In Greenbelt v. Bresler, supra, a real estate developer owned two pieces of land, The developer hoped to secure a zoning variance on one piece. The Greenbelt city council wished to purchase the other piece as the site for a school. During city council hearings on these negotiations, citizens accused the real estate developer of blackmailing the council in order to secure the zoning change. The Supreme Court found that this allegation was not capable of a defamatory meaning. 'It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood

exactly what was meant: it was Bresler's [the developer's] public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense . . . . the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. . . . ' 398 U.S. at 14, 90 S. Ct. at 1542." 296 A.2d at 882, n. 2.

were uttered on "newsroom." MacRae v. Afro-American Company, 172 F.Supp. 184 (E.D.Pa.1959), aff'd 274 F.2d 287 (3d Cir. 1960); Restatement of Torts § 563d; see also 12 P.S. § 1584a(1)(d). Because under Pennsylvania law a factor, in determining whether a statement may be capable of a defamatory meaning, is the nature of the audience reached by the publication, Sellers v. Time, Inc., supra, 423 F.2d at 890, the test is the effect the words are fairly calculated to produce, that is, the impression the words would naturally engender in the minds of the average persons who regularly watch WQED's "Newsroom." The words of Armstrong must be given by the court the significance that the "Newsroom" audience is likely to attribute to them. Boyer v. Pitt Publishing Company, 324 Pa. 154, 188 A.2d 203 (1936).

This court also notes that the determination of whether words are actionable without proof of special damages ("actionable per se") is a matter controlled by the substantive law of Pennsylvania. Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 367 F.2d 625 (3d Cir. 1966); Sweeney v. Philadelphia Record Co., 126 F.2d 53 (3d Cir. 1942). In this regard, we recognize that Pennsylvania treats slanderous words injurious to one's business or profession as actionable per se. Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., supra, 367 F.2d at 629.

On the other hand, the court's determination of the defamatory capability of Armstrong's statements will also consider that defendant in its brief, answer, and affidavit has raised truth as a defense to many of the allegedly defamatory statements specified by plaintiff. And, in Pennsylvania, truth is a complete defense to an action for defamation. Schonek v. W.J.A.C., Inc., 436 Pa. 78, 84, 258 A.2d 504, 507 (1969); Restatement of Torts § 582.

We must now apply the above criteria to the nineteen statements of Armstrong which Fram has said are defamatory. In assessing whether these statements are capable of being defamatory of Fram, our analysis attempts to place these statements in general categories. We note, however, that some statements could be appropriately placed in more than one of the categories used in our analysis.

Initially, we believe that several of the nineteen statements of which Fram complains must be determined as being incapable of a defamatory meaning because they do not actually refer to the plaintiff. Armstrong in statements 8 and 14 offers an opinion as to the role of the P.U.C. in overseeing taxicab service, while in statement 16 he differs with Fram on the validity of Fram's statistics. These statements are not capable, even in the most oblique way, of referring to Fram in a defamatory manner.

Still other statements, although they would be clearly understood as applying to the plaintiff, do not convey any meaning which would be capable of tending to lower Fram's status or his business' reputation in the minds of WQED's audience. Statement 2, in addition to being true, refers to the fact that the plaintiff, some nine months after Yellow Cab received a rate increase authorization from the P.U.C., was still enthusiastically searching for pubic support in his campaign to protest and annul that rate hike. The court fails to understand how this statement which fairly reflects Fram's activities could defame him. In statement 5, Armstrong bluntly characterizes the dilemma of Fram at that point in time; it is not capable of defaming Fram. Likewise, in statement 19, Armstrong merely rejects a face-to-face confrontation with plaintiff as meaningless by satirically suggesting that Fram's accusations must be weighed by legal rules of evidence. This statement undoubtedly annoys plaintiff but it clearly does not harbor a meaning which would be capable of slandering Fram.

All those statements wherein Armstrong either denies the accusations charged by Fram on the previous night's

"Newsroom" (statements 3, 4, 7, 15), or where Armstrong gives his impressions of Fram's previous statements (statements 1, 17) are not capable of a defamatory meaning. Plaintiff Fram did seriously accuse Yellow Cab of much wrongdoing on the previous show. Armstrong was entitled to express his impressions of Fram's statements.

■ It may be that statements 6, 10, 11, 12 and 13 are on their face actionable per se (that is, actionable without any showing of special injuries). It may be that the statements tend to harm Fram's reputation in his trade or business. However, they are not capable of being defamatory because defendant has proved that they are true. These five statements refer to the well-documented fact that the P.U.C. and the Pennsylvania Superior Court ruled that Peoples Cab's operation of allowing its drivers to choose their own working hours had violated Pennsylvania public utility laws.

■ The only remaining statements, numbers 9 and 18, if viewed in the abstract, also may appear to be damaging to Fram's reputation. However, as the law of Pennsylvania provides, the statements must be viewed in the context in which they were uttered. MacRae v. Afro-American Company, supra; Boyer v. Pitt Publishing Co., supra. Recalling that the nature of the audience hearing the remarks is a key factor in considering whether they are capable of a defamatory meaning, Sellers v. Time, Inc., supra, the court believes that neither statement 9 or 18 are capable of being defamatory in the context in which they were made on "Newsroom."

Remembering that the statement must be more than personally embarrassing or annoying, Scott-Taylor, Inc. v. Stokes, supra, and that it must be more than a "vigorous epithet" or a "rhetorical hyperbole," Redding v. Carlton, supra, we consider whether statement 9 is capable of a defamatory meaning under Pennsylvania law. The July 23, 1970 transcript of "Newsroom" (included herein) reveals that Armstrong's statement was uttered in the following context:

John Roberts: "Mr. Fram did suggest at least that the P.U.C. and Yellow, the P.U.C. might be trying to put Peoples out of business in order to benefit Yellow Cab. Now, what's your reaction to that bit?"

David Armstrong: "Well, ha, that sounds to me a little bit like the sort of paranoid thinking that you get from a schizophrenic, where one is suspicious of everyone else around him because he, himself doesn't conform to the standards of conduct required." Transcript at p. 4.

Fram's complaint and his brief make it clear that this is the statement he believes most vilifies his reputation and status in the Pittsburgh community. Fram, in his deposition, described the remark as "the topping of the cream that destroyed my life." Deposition p. 210. Fram contends that this comment was the culmination of Yellow Cab's previously unsuccessful scheme to discredit him and his company.

■ We do not believe that the contentions by the plaintiff have been supported. We do not believe that the "Newsroom" viewers would understand the words "paranoid" and "schizophrenic" to refer to an actual physiological or mental affliction of Fram. Such a burden of proof is required of a plaintiff in a defamation action by the Pennsylvania statute 12 P.L. § 1584a(1)(d).[11] However, the reading of the history of the prior controversy between Fram (Peoples' spokesman), the P.U.C., and Yellow Cab, the very serious accusations made by Fram against Yellow Cab on the previous "Newsroom," and the manner in

11. "§ 1584a. Burden of proof
(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
\* \* \* \* \*

(d) The recipient's understanding of its defamatory meaning.

which the "Newsroom" commentator drew out statement 9 from Armstrong as a response to one of Fram's most derogatory accusations, leads this court to conclude that the average viewer of "Newsroom" would understand them to be what they actually were—a rebuttal and criticism of Fram's accusations against Yellow Cab. In the context in which statement 9 was uttered, Armstrong's remark does not represent an unprovoked or abstract personal attack on the plaintiff.

In Redding v. Carlton, supra, 296 A.2d at 882, the Superior Court of Pennsylvania in reaching its conclusion that the statements therein were not legally capable of a defamatory meaning, relied on the reasoning of the Supreme Court of the United States in Greenbelt v. Bresler, supra. In *Greenbelt,* the court said in construing the word "blackmail" as used in defendant's article, "It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant; it was Bresler's [the developer's] public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense . . . the word was no more than rhetorical hyperbole, a vigorous epithet . . . . " Id. 398 U.S. at 14, 90 S.Ct. at 1542.

Armstrong's use of the words "paranoid" and "schizophrenic" in this statement is indistinguishable from the defendants' use of the word "blackmail" in the *Greenbelt* case. And as in *Greenbelt,* Armstrong's words here may be properly characterized as "rhetorical hyperbole" or "vigorous epithets." The words could not be understood by the "Newsroom" audience in their literal sense.

■ Armstrong's remark was drawn out by the program's commentator in an attempt to provoke Armstrong's response to the accusations by Fram against Yellow Cab on the preceding night's program. Armstrong's statement was merely a part of the countercharge waged by him for Yellow Cab against Fram. In this context, Armstrong's statement is not capable of a defamatory meaning.

■ Two other considerations support our conclusion that statement 9 is not capable of being defamatory. First, under Pennsylvania law more latitude is extended to spoken words than to printed matter on the theory that words are spoken in the heat of the moment and quickly vanish, while writing reflects more deliberate and considered action and the effect is more lasting. Johnson v. Hackett, 284 F.Supp. 933 (E.D.Pa. 1968); Collins v. Dispatch Publishing Co., 152 Pa. 187, 25 A. 546 (1893).

■ Secondly, WQED's "Newsroom" audience is accustomed to hearing criticism, accusation, and controversy. Unlike the traditional news broadcasts of the commercial networks where the subject is presented to the viewers in an objective, factual, straightforward manner, "Newsroom" instead strives to discuss the news by encouraging comment on it from its guests and preferably from the participants in the newsworthy event. Because Pennsylvania law provides that the nature of the audience hearing the remarks is significant in considering whether the complained-of word is capable of a defamatory meaning, Sellers v. Time, Inc., supra, we believe that this consideration also points toward our conclusion that statement 9 is not capable of a defamatory meaning.

WQED's "Newsroom," like the other discussion programs carried on this public station (i. e., "The David Susskind Show," "Firing Line"), attempts to have the subject debated in a spontaneous and unrehearsed fashion. The format of "Newsroom" is to encourage controversy over the issues of local interest in the Pittsburgh area. Opinion, criticism, exaggeration, and hyperbole are commonplace on "Newsroom" as the guests en-

thusiastically thrust their personalities and emotions into the topic of discussion. The average viewer, accustomed to such fare, would not understand Armstrong's remark to be a statement of Fram's state of health any more than the reader in *Greenbelt* would have understood that the word "blackmail" charged the plaintiff with commission of a crime.

 Similarly, statement 18 is not capable of a defamatory meaning. Armstrong responded to a question by news commentator Bill Banks (Transcript p. 7) on the subject of Peoples Cab's ability to operate on lower fares than Yellow Cab. Armstrong replied that he did not believe that Peoples could operate profitably at lower rates than Yellow because for several years Peoples had lost money and incurred mounting deficits. Armstrong said:

> " . . . I assumed that he needs it actually. The only way he could make his illegal operation work is to live off of the drivers who will not earn anything in this type of operation, who will leave and there will be a constant turnover of inexperienced and incompetent, incapable drivers, while Mr. Fram, because his charges to them to lease the vehicle will be such that he will be the only one who profits by it." Transcript at p. 7.

We note that the first part of this statement, the reference to Peoples' illegal operation, is not defamatory because it is true. As previously noted, the P.U.C.'s order of May 27, 1969 (Investigation Docket No. 92) found that Peoples Cab was in violation of Part IV, Section 15, of the P.U.C.'s Supplemental Taxicab Regulations.

The second portion of Armstrong's statement is another response to the position of Fram. Armstrong was aware of the operation of plaintiff's taxicab service. Armstrong knew that Peoples' fleet of cabs on the Pittsburgh streets had been dwindling for the past few years as a result of Peoples' increasing financial problems. Fram, in his appearance before Pittsburgh City Council on October 15, 1969, indicated that his fleet of cabs had been reduced from 210 cabs in 1967 to approximately 40 in 1969, and that Peoples was going bankrupt as it owed almost $250,000 in October of 1969. Notwithstanding this financial situation, Fram expressed the opinion on "Newsroom" that he could operate at a lower rate than Yellow Cab. In response to this unrealistic position of Fram, Armstrong opined that there would be a constant turnover of drivers and if profits were made, it was Fram who would make them.

Armstrong may have exaggerated the extent to which Fram profited under Peoples' plan of operation. Taken as an isolated statement, the impact of the statement may be substantially annoying and embarrassing to Fram. However, Pennsylvania law mandates that statements allegedly capable of defamatory meaning must be examined by the court in the context in which they were uttered, MacRae v. Afro-American Company, supra, and because the nature of the audience is a key factor in determining whether a statement may be capable of a defamatory meaning, Sellers v. Time, supra, we believe that statement 18 is not capable of a defamatory meaning in its factual context.

For the reasons we indicated in our discussion about statement 9, the typical "Newsroom" viewer would not have understood this statement as being anything more than another response to Fram's position in the taxicab controversy. The statement in question is a combination of truth intertwined with Armstrong's criticism of Fram's taxicab operation. The truthful part recites the fact that Fram, as president of Peoples, did in fact operate what the P.U.C. deemed to be an illegal lease plan. Also true under such a lease plan is the fact that the tax liabilities of the company for the drivers were eliminated. Because the drivers were deemed independent contractors under Peoples' lease plan, Fram as president of Peoples would have few liabilities to the drivers.

Under such a plan, Fram could continue to make a small profit even though Peoples' fleet of cabs was being reduced. The extent to which Fram ultimately profited was exaggerated by Armstrong's statement.

For the reasons we have stated above, this court concludes that not one of the 19 statements specified by Fram would be characterized as capable of a defamatory meaning under the applicable substantive law of Pennsylvania.

**V**

Defendant also claims that summary judgment is a particularly appropriate remedy for this case because the record as a whole reveals an absence of any showing by Fram that Armstrong's statements were made with actual malice, that is, with knowledge of their falsity or with reckless disregard of whether they were true or false. Yellow Cab refers to the many cases applying the rule of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), where summary judgment was proper because the record was devoid of any genuine issue of fact as to actual malice. Bon Air Hotel v. Time, Inc. 426 F.2d 858 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir.), cert. denied 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); Treutler v. Meredith Corp., 455 F.2d 255 (8th Cir. 1972); Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir. 1972); and Spern v. Time, Inc., 324 F.Supp. 1201 (W.D.Pa.1971).

In New York Times Co. v. Sullivan, supra, 376 U.S. 254, 84 S.Ct. 710, the Supreme Court held that the constitutional guarantees of freedom of speech and the press prohibit recovery of damages in a libel action brought by a public official against critics for defamatory comment about his official conduct "unless he [the public official] proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726. The court reasoned that "if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive,'" 376 U.S. at 272, 84 S.Ct. at 721, factual error, defamatory content and even resort to exaggeration and vilification are essential to free public discussion.

In Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the court, in affirming the decision of the Third Circuit Court of Appeals, extended the application of the *New York Times'* constitutional privilege further "to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." 403 U.S. at 44, 91 S.Ct. at 1820. In *Rosenbloom*, Justice Brennan, writing the plurality opinion,[12] focused on society's interest in being informed of certain issues: "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved or because in some sense the individual did not choose to become involved." Id. 403 U.S. at 43, 91 S.Ct. at 1819.

The Court of Appeals in Gordon v. Random House, Inc., 486 F.2d 1356 (3d Cir. 1973), "experience[d] some discomfort in accepting the *Rosenbloom* plurality opinion as a definitive statement of the appropriate law . . . ." 486 F. 2d at 1359. In *Random House*, the District Court had relied on *Rosenbloom* in granting defendant's motion for summary judgment. 349 F.Supp. 919 (E.D. Pa.1973). Judge Aldisert directed that the lower court develop a more adequate record in which the district judge as a

12. In *Rosenbloom*, the eight Justices who participated (Justice Douglas did not participate) expressed their views in five different opinions. Justice Brennan's plurality opinion was joined by Justice Blackmun and Chief Justice Burger. Justice Black concurred on a broader ground, stating that the First Amendment gives the news media an absolute immunity from liability while Justice White concurred on a narrower ground. Justice Marshall, joined by Justice Stewart, dissented in a separate opinion. And Justice Harlan filed a dissenting opinion for a different reason.

matter of law decides (1) whether the subject matter of the allegedly defamatory material constituted an event of "public or general concern," and (2) whether there was on the part of the plaintiff an "involvement in such an event." 486 F.2d at 1361–1362. The court also stated that "insofar as the courts of this circuit are concerned, the ruling case law of *Rosenbloom* is that which is contained in our opinion when that case was before us. 3 Cir., 415 F.2d 892." 486 F.2d at 1360.

Judge Aldisert's opinion in *Random House* anticipated the opinion of the Supreme Court in Gertz v. Robert Welsh, Inc., —— U.S. ——, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The issue in *Gertz* is "whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege [the New York Times protection] against liability for the injury inflicted by those statements." —— U.S. at ——, 94 S.Ct. at 3003. The facts of *Gertz* are: after a Chicago policeman was convicted of murder, the victim's family retained plaintiff Gertz, a reputable attorney, to represent them in civil litigation against the convicted policeman. Thereafter, an article appeared in defendant's magazine alleging that the policeman's murder trial was part of a Communist conspiracy to discredit local police, that plaintiff had arranged the police officer's "frame-up," and that plaintiff was a "Communist-fronter" with a criminal record.

 We read *Gertz* as an affirmation of the opinion expressed by Judge Aldisert in *Random House.* Under *Gertz,* the inquiry as to whether the *New York Times'* protection applies does not cease once it is determined that the defamatory publication concerns an event of public concern. The inquiry must continue to determine whether the private individual has become a public figure.

Defendants, in their brief filed before the Supreme Court's decision in *Gertz,* claim that the *New York Times'* consti-

tutional protection applies to Armstrong's statements on the basis of the *Rosenbloom* decision. If the *New York Times'* protection applies, Fram cannot recover unless he shows that Armstrong's statements were uttered with the knowledge that they were false or with reckless disregard of whether they were false or not. Under *Gertz,* the defendant's contention is still valid. There is little doubt that the taxicab controversy between Yellow Cab and Peoples Cab was a bona fide matter of public or general concern for the citizens of Pittsburgh. Fram, in his deposition, conceded that the broadcast of July 22 and July 23 related to matters of public or general concern. Furthermore, plaintiff's deposition reveals that prior to this appearance on "Newsroom" on July 22, he knew that the subject matter of his interview on WQED would be the taxicab situation in Pittsburgh, which naturally included the P.U.C.'s orders against Peoples Cab Company and the rate increase by defendant Yellow Cab. The very fact that the taxicab situation in Pittsburgh was covered on a television broadcast called "Newsroom" provides convincing evidence of the subject's public nature.

The question as to whether the *New York Times'* constitutional privilege protects Armstrong's statements turns on whether Fram has become a public figure. If Fram is a public figure, then the *New York Times'* protection applies to Armstrong's statements and Fram would necessarily be required to surmount the actual malice obstacle in order to recover damages in his defamation action. The Supreme Court in *Gertz,* supra, explained the manner in which a private person could become a public figure:

"Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. . . . More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in or-

der to influence the resolution of the issues involved. In either event, they invite attention and comment." —— U.S. at ——, 94 S.Ct. at 3009.

The court in *Gertz* rejected defendant's contention that the plaintiff had become a public figure by representing the victim's parents in civil litigation against a Chicago policeman convicted of their child's murder. The court noted that Gertz had never discussed either the criminal or civil litigation with the press. —— U.S. at ——, 94 S.Ct. at 3012.

■ Fram's activities are clearly distinguishable from those of Gertz; it is evident that Fram intentionally sought the press and the media to publicize his criticism of Yellow Cab's rate increase. Fram's activities qualify him as a public figure under *Gertz*. The plaintiff's activities prior to Armstrong's interview show his complete and enthusiastic involvement in the taxicab controversy. Fram appeared before Pittsburgh's City Council to petition its support in forcing the P.U.C. to hold public hearings on Yellow Cab's fare hike. During Fram's appearance before City Council and again in his appearance on "Newsroom" on July 22, 1970, Fram thrust himself into the controversy as he freely and openly criticized the P.U.C. and Yellow Cab. Like General Walker[13] in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094, Fram has thrust his person into the "vortex" of a public controversy. See also Grove v. Dun & Bradstreet, Inc., 438 F.2d 433, 435 (3d Cir. 1971).

The plaintiff, in his brief, seems to advance two reasons why he believes that the *New York Times'* rule is inapplicable to the factual context of this action.

■ Fairly stated, plaintiff's first argument appears to be that because the television station is not a party to the action and because we are concerned not with the printed word but with "an oral defamation as part of the corporation's (Yellow Cab's) continuing scheme to destroy the reputation and property of the plaintiff," the *New York Times'* standard of actual malice should not apply. Plaintiff's argument is unfounded. This court notes that in the case of St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262, a deputy sheriff sued a candidate for public office for a defamation which allegedly occurred in one of the defendant's televised speeches. Although St. Amant had sued a non-media defendant, and although the cause of action arose out of an oral statement of the defendant, the Supreme Court remanded the case to the state court for the proper application of the *New York Times'* actual malice standard. The application of the *New York Times'* constitutional prohibition does not turn on whether the defendant is the communications media.

■ Equally non-meritorious is plaintiff's argument that the First Amendment does not apply to corporations because freedom of speech is personal. There is no basis for such a contention. We note that the First Amendment was the basis for the decision in New York Times v. Sullivan, supra, and the New York Times is obviously a corporation. This contention by plaintiff is frivolous.

---

13. In Associated Press v. Walker, a companion case to Curtis Publishing Co. v. Butts, supra, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. 2d 1094, the court discussed its reasoning for extending the *New York Times'* constitutional protection to public figures who are not public officials. The court noted that Walker was a private citizen but that he had become a public figure by his highly publicized statements urging citizens to resist the federal efforts to enforce a court decree ordering the enrollment of a Negro, James Meredith, at the previously all-white University of Mississippi. Walker had made several statements over radio and television urging people to "[r]ise to a stand beside Governor Ross Barnett at Jackson, Mississippi." Furthermore, Walker arrived in Jackson, Mississippi, and held a press and television conference in which he called for "violent vocal protest." The court concluded that the *Times'* constitutional protection extended to Walker because he, in becoming a public figure, had voluntarily thrust his personality into the "vortex" of a public controversy.

1335

Judge Knox in Spern v. Time, Inc., supra, stated:

"We are mindful of the rules that summary judgments are to be sparingly granted and that doubtful cases should go to trial. We are admonished, however, that in cases falling within the rules of the New York Times, supra, and its progeny, summary judgment should be entered when there is no evidence of actual malice or reckless disregard of the truth so as to avoid a chilling effect on freedom of the press."

"The grant of summary judgment . . . must be considered in the light of the Supreme Court's observation in New York Times Co. v. Sullivan, 376 U.S. at 279, 84 S.Ct. at 725, that 'Would be critics * * * may be deterred from voicing their criticism, even though it is believed to be true and even though it is, in fact, true because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone'." 324 F.Supp. at 1204.

Courts have denied summary judgment where the facts presented indicated that a jury could find that a statement was made with actual malice. Wasserman v. Time, Inc., 138 U.S.App. D.C. 7, 424 F.2d 920 (1970); Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969), aff'd 261 F.Supp. 784 (S.D.N.Y. 1966); Stearn v. MacLean-Hunter, Ltd., 46 F.R.D. 76 (S.D.N.Y.1969). Most recently this Circuit in Gordon v. Random House, Inc., supra, vacated the grant of summary judgment by the District Court with the observation that in deciding whether to grant summary judgment, the court is "not called upon to evaluate the quantum of evidence adduced at trial; we therefore do not have properly before us the question of whether the evidence met . . . the 'convincing clarity' test of the New York Times. We only decide whether a material fact is controverted in the context of a genuine issue." 486 F.2d at 1362.

Whether proof of actual malice exists is an issue which must be decided by the trial judge on motion for summary judgment. The court's responsibility at the motion stage of the proceeding has been explained as follows:

"In my judgment New York Times Co. v. Sullivan makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the Times test of actual knowledge or reckless disregard of the truth. Cf. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the Times sense, it should grant summary judgment for the defendant." (D.C.Cir.1970) (Wright, J., concurring).

The showing of malice may not be presumed but is a matter for proof by the plaintiff. Time, Inc. v. McLaney, supra, 406 F.2d at 572. Furthermore, the bare allegation of malice, standing alone, is not sufficient to withstand a motion for summary judgment. Goldman v. Time, Inc., 336 F.Supp. 133, 138 (N.D.Cal.1971).

In its most complete statement on the real significance of the phrase "reckless disregard" as part of actual malice, the Supreme Court in St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), explained:

" 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for further definition of a reckless publication. In New York Times, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was

circulating false information. In Garrison v. Louisiana, 379 U.S. 64, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity.' * * * These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 730, 731, 88 S.Ct. at 1325.

We have concluded that under Pennsylvania law, none of Armstrong's statements are capable of a defamatory meaning. Even if we assumed that the Armstrong statements are capable of a defamatory meaning, our review of the record shows no factual support for the proposition that the plaintiff can prove that the statements were uttered with actual malice in the *Times'* sense. Fram's affidavit to the effect that Armstrong's attitude toward him was "definitely unfriendly and at times antagonistic, indicating malice such as has been demonstrated by officers and agents of Yellow Cab throughout the long, and sometimes violent, determination of Yellow Cab to eliminate Peoples Cab from competition in the Pittsburgh district" is only conclusory. Although apparently Fram is truly convinced that Yellow Cab with the assistance of the P.U.C. has been attempting to destroy Peoples Cab for the last decade or more, there is no objective evidence of any such conspiracy. Still, Fram, at the Pittsburgh City Council meeting on October 15, 1969, and again on "Newsroom" the night before Armstrong's appearance, vigorously professed his belief in such a movement by defendant Yellow Cab and the P.U.C.

Also in his affidavit, Fram claims that during his interview with Roberts on the July 22, 1970 "Newsroom" program, "no reference was made to the character, professional or personal integrity of Mr. Armstrong, nor was any invitation inferred to him [Armstrong] to indulge in personal assaults upon plaintiff's reputation, sanity, personal or business affairs. . . ." We note that Armstrong is not a party to this suit. Fram, as plaintiff, has sued the Yellow Cab Company. The purpose of Fram's affidavit in this aspect seems to be that Armstrong's comments, on behalf of Yellow Cab, were not justified because Fram in his interview did not mention Armstrong personally.

The affidavit of Armstrong states: "My only purpose in appearing on that program was to correct the numerous false statements made and false impressions created by Mr. Fram. I did not use a prepared script, but spoke extemporaneously from my knowledge, as counsel, of Yellow Cab Company's affairs. I made absolutely no statement which I knew to be false nor any statement about which I had a reasonable doubt as to its truth. I spoke merely to correct what I believed to be, and knew to be, false and misleading statements by Mr. Fram on the "Newsroom" program the preceding evening." Affidavit p. 6.

Rule 56(e) of the Federal Rules of Civil Procedure provides:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Upon this record it cannot be said that the plaintiff has made any specific showing on the issue of actual malice. As has been noted, the law has been uni-

formly stated on this point: "Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment." Bon Air Hotel, Inc. v. Time, Inc., *supra,* 426 F.2d at 864; Wasserman v. Time, *supra,* 424 F.2d at 922; Spern v. Time, Inc., *supra,* 324 F.Supp. at 1204. Without regard to the quantum of evidence plaintiff would be required to prove at trial, the record here discloses a total absence of knowing falsehood or reckless disregard for the truth.

Fram does not argue, as has been argued in other cases, that Armstrong's statements inherently evidence a knowing falsity or reckless disregard of the truth. For example, apparently the plaintiff in Gordon v. Random House, *supra,* relied not only on Random House's failure to investigate the truth or falsity of its allegations but on an "accumulation of various other factors." Gordon v. Random House, supra, 486 F.2d at 1358.

As the court notes in *Gordon,* 486 F.2d at 1358, "Mere investigatory failures, without more, have been held insufficient to constitute 'reckless disregard'." Other factors include the "inherent improbability of the statements" as in *Gordon,* Id. at 1358, or the "highly inflammatory references" as in Rosenbloom v. Metromedia, Inc., *supra,* 415 F.2d at 898, or indeed possibly the "cumulative effect" of several factors, as in *Gordon.*

As Judge Seitz noted in *Rosenbloom* "it is difficult to see how characterizing them (the allegedly defamatory references) as inflammatory tends to prove the requisite awareness of their probable falsity." 415 F.2d at 898. The District Court had concluded that the references to the defendants as girlie-book peddlers and smut distributors "constituted evidence of a reckless disregard of plaintiff's rights." Id. at 898. The circuit reversed, finding that the District Court should have granted defendants' motions for a directed verdict and for judgment n. o. v.

In Time, Inc. v. Johnston, supra, 448 F.2d at 384, the plaintiff supported his contention that the statement was known by the defendant to be false and defamatory (and therefore the defendant was not able to claim immunity under the *Times'* doctrine) by pointing to two phrases of the statement as being "knowingly false and defamatory." The phrases were "destroyed" and "psychologically destroyed."

The Circuit Court reversed the lower court's denial of defendant's motion for summary judgment in *Time, Inc.* The facts were: The plaintiff, a former professional basketball star, claimed that he had been defamed by an article appearing in *Sports Illustrated* about Bill Russell, former professional basketball star of the Boston Celtics. In the article, entitled "Sportsmen of the Year," the writer interviewed Russell's coach, Red Auerbach, who opined that Russell first began to emerge as a star when he "destroyed" or "psychologically destroyed" the plaintiff on the basketball court to such an extent that Russell "practically ran him out of organized basketball." The court, rejecting the "inherent improbability" argument advanced by plaintiff, said:

> "No one reading the article would have assumed that Auerbach was stating that the plaintiff was actually and literally 'destroyed' . . . . In describing the event, he used phrases of some vividness, used them in a figurative, not literal, sense. . . . *New York Times* . . . does not interdict legitimate or normal hyperbole. . . . Just as it was plain in Greenbelt Co-op. Pub. Ass'n v. Bresler, supra, 398 U.S. at p. 14, 90 S.Ct. at p. 1542, 26 L.Ed.2d 6, that the term 'blackmail' was mere hyperbole and did not charge the 'commission of a criminal offense' . . ., so the phrases here were hyperbolic and meant, taken in proper context, merely that Russell had completely outplayed and over-shadowed the plaintiff. . . ." 448 F.2d at 384–385.

In this case, Armstrong's use of the words "paranoid" or "schizophrenic"

were figuratively used,[14] and in the context of this taxicab controversy, no viewer of "Newsroom" could have understood them as anything more than a reaction to Fram's accusations.

We conclude that not only should the defendant's motion for summary judgment be granted because, under Pennsylvania law, the nineteen Armstrong statements are not capable of a defamatory meaning, but that the granting of the motion for summary judgment may rest as well on our conclusion that the First Amendment standard of actual malice is applicable to this case, and that the plaintiff has failed to show a genuine issue of material fact as to that standard.

14. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).